**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- --------------------------------------------------------X
                                                  :
**UNITED STATES OF AMERICA,**          :          **S8 1:16 CR 809-06 (VM)**
                                                  :
                        -v-                        :
                                                  :
**WALSTON OWEN**
                                                  :
                        **Defendant.**             :
- --------------------------------------------------------X


## SENTENCING  MEMORANDUM


Submitted by:

Alain V. Massena, Esq. &
Xavier R. Donaldson, Esq.
*Attorneys for Walston Owen*
305 Broadway, Suite 1001
New York, NY 10007
212-766-1700
avm@massenalaw.com

**MASSENA LAW P.C.**

305 Broadway, Suite 1001
New York, New York 10007
(P) 212-766-1700 ♦ (F) 212-766-1701
Email: AVM@Massenalaw.com

♦ Admitted in Federal and
New York State Courts

July 1, 2022

**VIA ECF and Email**
Honorable Victor Marrero
Senior United States District Court Judge
United States Courthouse
500 Pearl Street
New York, New York

Re:    *United States v. Walston Owen*
       0208 1: S8 16 CR 809-06 (VM)

Dear Judge Marrero:

**A DREAM DEFFERED**

Mr. Owen's journey to this moment in time follows an all too familiar path, a path littered with abandonment, poverty, hope, violence, tragedy, and despair. However, the tale's familiarity does not diminish the necessity of it being told. This Court is required to consider Mr. Owen's history among other factors in fashioning an appropriate sentence pursuant to 18 USC §3553(a). We respectfully submit that a period of incarceration up to 240 months is sufficient but not greater than necessary to meet the goals of justice pursuant to §3553(a).

Mr. Owen's childhood was not an easy road. Born on November 19, 1983, in Jamaica, West indies, his father deserted his mother once she became pregnant. Mr. Owen's mother. Gloria Osborne was left alone to care for all of Mr. Owen's, physical, emotional, and financial needs. His mother migrated to the United States of America shortly after his birth, seeking to lay the groundwork for a better life for her children in America.[1]

Mr. Owen was left behind in Jamaica and was shuffled from one home to the next for food and shelter. His connection with his mother during his childhood was sporadic. He remembers speaking to his mother once every few months, but not feeling connected to her during most of his childhood.[2] His first memory of meeting his mother was at the age of seven.[3] He did not see his mother again until he was sixteen years old. During this formative period of his childhood, he recalls growing up without basic necessities. He recalls struggling for food,

---

[1] Presentencing Investigation Report (PSR)., dated 08/10/20. (PSR ¶. 77)
[2] Nancy M. Tricamo, LCWS, Sentencing and Mitigation Specialist – Mitigation Report dated , July 5, 2021, (Exhibit A)
[3] PSR ¶ 79

2

clothing, shelter, and water. During his childhood, instead of being surrounded by a caring family he was surrounded by communities that were overrun with violence, drugs and gangs. At the age of sixteen, his family decided to move him from Jamaica to the Bronx, to escape the poverty and violence he faced in his homeland.[4]

Little did Mr. Owen know that relocating to the Bronx at the tail end of the crack epidemic would not provide him the escape from the violence and gangs of which he had dreamed. The Bronx in the late 1990's was overrun with drugs and violence, Mr. Owen, being a foreigner in a new and strange land, was ill prepared to handle what was in store for him. He was once again left to fend for himself, while his mother worked long hours to financially support him and his siblings.

During High School, Mr. Owen was constantly attacked by the gangs that controlled the Strafford area of the Bronx where he lived. After being assaulted numerous times, he was recruited into the Rollin' 30's, a sect of the Crips gang. Mr. Owen's stated that "gangs back then were different" they were a means of protection, survival, family.[5]

Mr. Owen's mother, finding her family surrounded by the same gang and drug violence she tried to escape in Jamaica, decided that it was time that her son lived with his father in Connecticut. Mr. Owen describes moving in with his father as "moving in with a stranger." In Connecticut, Mr. Owen attended Winchester High School, he learned that he had a passion for cooking, in particular cooking for others. Unfortunately, he also learned that despite the winding road that he had traveled thus far, he was still very much alone. Mitigation specialist Ms. Tricamo writes in her mitigation report: " When asked to think of someone he looked up to during his childhood, Walston struggled to come up with anyone. During his formative years, [Mr. Owens] was tragically alone." His father failed to support his interest and was an immaterial presence in his life. At the age of 19, he decided to move back to the Bronx because his father showed no interest in him or his dreams. Mr. Owen has not spoken to his father since.

Upon his return to the Bronx, Mr. Owen did reconnect with members of the Rollin 30's the only family that ever provided him with the emotional and social support he craved as a child, but he also worked hard to create a productive life for himself. He began doing construction work, mostly as an apprentice electrician. In 2009, his brother Paul, who relocated to the U.S. and was also living with their mother, got him a job at ServePro, a construction, restoration, and demolition company in Westchester. Mr. Owens was employed at ServePro until he was arrested in 2017. He maintained this employment consistently for eight years and was a valued employee.

In addition to working, Mr. Owen also sought to create for himself the cohesive family structure that he never had. He married Unique Marshall and they lived together at his mother's home. Unfortunately, the relationship between Mr. Owen's mother and his wife was acrimonious. Ultimately, the two were unable to co-exist, and the friction between his mother and wife caused Owen's marriage to Unique to deteriorate. The couple divorced in 2012. After his divorce Mr. Owen became involved with Ebony Brown. They had a child together, Z.B.. Mr. Owen loves and adores his daughter. He maintains an amicable relationship with Ms. Brown and they co-parent Z together. Mr. Owen is a consistent presence in Z.'s life. Despite being incarcerated now for nearly 5 years he continues to speak to his daughter whenever he can. It is of special note that the Pre-sentencing report expends nearly five paragraphs

---

[4]  PSR ⁋ 80, see also Exhibit A (mitigation Report)

[5]  See Exhibit A (mitigation Report)

describing Mr. Owen's love and dedication to his daughter Zoe. (PSR ¶¶ 84-88) Mr. Owen's special relationship with his daughter is evident from their seafood and movie Fridays to the financial support he provides for her. Ms. Brown shared with Probation that Mr. Owen is a loving and resolute father to Z.B..[6] The mitigation report submitted by Ms. Tricamo also describes the emotional affect that Z. has on Mr. Owen.[7] And I can attest as well to observing first, hand in my conversations with Mr. Owen how deeply he loves his daughter.

The tragedy of Mr. Owen's tale is that abandonment, poverty, drugs, gangs, and violence are at the root of multiple deferred dreams. The dream of his mother to have a better life for her family here in the United States of America. Mr. Owen's dream to pursue his love for cooking and opening his own restaurant. The dreams of a daughter wanting her father to be present in her life. Those dreams are no longer feasible as Mr. Owen accepts that as result of his conviction he will be sentenced to a significant period of incarceration.

## ANALYSIS OF 18 USC 3553 FACTORS

18 USC Section 3553 calls upon this Court to consider specific factors, including the appropriate Sentencing Range, to impose a sentence on a defendant that is "sufficient but not greater than necessary" to comply with the goals of sentencing. *See, 18 USC Section 3553(a)*. Indeed, any sentence imposed by the Court must be based upon an individualized assessment based upon the unique factors presented. *See*, *U.S. v. Gall*, 552 US 38, 39 (2007).

Significantly, the United States Sentencing Guidelines merely reflect a "rough approximation of sentences that might achieve section 3553(a)'s objectives." *See*, *Rita v. United States* 551 US 338, 350 (2007). The Court "may not assume that the Guidelines Range is reasonable." *Gall*, at 50. As the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id*., at 351 (emphasis in original).

After giving both parties an opportunity to argue for whatever sentence they deem appropriate, the District Court should then consider all of the 3553(a) factors to determine whether they support the sentence requested by a party." *U.S. v. Gall*, at 49-50. We submit that after considering all the factors articulated in 18 USC 3553, this Court should sentence Mr. Owen to a period of incarceration significantly below the guidelines range.

### Nature and Circumstances of the Offense

On February 24, 2020 Mr. Owen was convicted after trial for Conspiracy to Commit Racketeering (18 U.S.C. section 1962 (d) and 1963(a)); Assault and Attempted Murder in Aid of Racketeering (18 U.S,C, section 1959(a)(5)); Discharging A Firearm During and in Relation to a Crime of Violence (18 U.S.C. section 924(c)(1)(A)(i)(ii) and (iii); Assault in Aid of Racketeering (18 U.S.C.) section 1959(a)(3)).

Count 1 of the superseding indictment alleges that from 2009 to 2017 Mr. Owen along with other members of the "Rollin 30s Crips" participated in racketeering activity consisting of multiple acts involving murder, attempted murder, conspiracy to commit murder; multiple

---

[6] PSR 85
[7] See Exhibit A (mitigation Report)

acts involving robbery, attempted robbery, conspiracy to commit robbery; and multiple offenses involving the distribution of controlled substances. S8 16 CR 809 (VM).

A notice of special sentencing factors in relation to Count 1 further alleges that on March 26, 2015, Richard Feliz obtained a .40 caliber gun; located a rival gang member, fired multiple shots in the direction of his intended target and struck and killed Victor Chafla an innocent bystander. During trial, the prosecution presented testimony from a cooperating witness stating that he was informed by the shooter Mr. Feliz that "the opps are out on Morrison."

Count 2 of the superseding indictment charged that on May 14, 2015, Mr. Owen and other members and associates of the Rollin' 30s, participated in a drive by shooting in an attempt to murder a member of an opposing crew, injuring two innocent bystanders. Count 3 of the superseding indictment alleges that during the course of the May 14, 2015, drive by shooting Mr. Owen used, carried and possessed a firearm, which was brandished and discharged.

Finally Count 4 alleges that on June 10, 2015, Mr. Owen and other members of the Rollin 30s, assaulted and injured Luchone Elzey a member of an opposing crew.

## The Personal History Of And unique Characteristics Warrant a Significant Downward Variance

### Poverty and Abandonment

"Abandonment was a predominant theme in Walston Owens's life. His mother left him in Jamaica shortly after he was born to move to the U.S. for work. … he did not really know her until he was sixteen … his father also left him to relocate to the U.S. … [o]nce he relocated to the U.S.; Mr. Owen was once again left to take care of himself due to his mother's job responsibilities. ... [h]is parents were never able to provide a consistent and structured home for Mr. Owens."[8]

This court should consider the extreme poverty and the lack of a consistent role model in Mr. Owen's childhood when fashioning a sentence sufficient but not greater than necessary to meet the goals of justice pursuant to §3553(a). The presence of extreme poverty and the lack of a stable household has been found to lead to negative outcomes for adults. Adults that have experienced extreme poverty and a lack of stability during childhood have been shown to exhibit multiple negative high-risk indicators.[9]. Studies have shown that:

Adult achievement is related to childhood poverty and the length of time they live in poverty. Children who are poor are less likely to achieve important adult milestones, such as graduating from high school and enrolling in and completing college, than children who are never poor.[10]

Throughout his childhood Mr. Owen faced extreme poverty. He struggled for food and other necessities. Abandoned physically and emotionally by his mother the individuals

---

[8] See Exhibit A (mitigation Report)

[9] See Urban Institute "Child poverty and Adult success" Caroline Ratcliff, 2015.
https://www.urban.org/sites/default/files/publication/65766/2000369-Child-Poverty-and-Adult-Success.pdf,

[10] See Urban Institute "Child poverty and Adult success" Caroline Ratcliff , 2015.
https://www.urban.org/sites/default/files/publication/65766/2000369-Child-Poverty-and-Adult-Success.pdf,

that cared for him often failed to provide him with shelter, food, clothes and at times even water.

Owen spent his entire childhood moving from one residential home to another. The lack of stability and the lack of role models in his early childhood is one of the main reasons that he was able to be easily recruited by the Rollin 30's. Residential instability stands out as key factor in determining a child's likelihood of success. "Household moves that happen for negative reasons are particularly associated with worse outcomes. Ever-poor children with three or more negative moves (versus no moves) during their childhood, for example, are 15 percent less likely to complete high school by age 20, 36 percent less likely to enroll in college or another postsecondary education program by age 25, and 68 percent less likely to complete a four-year college degree by age 25."[11]

When asked to think of someone he looked up to during his childhood, Mr. Owen struggled to come up with anyone.[12] It is clear that "[r]ole models can help adolescents overcome the risk they face by being exposed to negative non-parental adult behavior." Adults are vital resources to help protect youth from the noxious effects of risk they face.[13] Mr. Owen's youth was devoid of such adult protection thus opening the door for the insidious influence of violence and gangs.

The opposite of poverty is justice.[14]. It is right and it is just to fully consider Mr. Owen's unique and personal characteristics in fashioning an appropriate sentence pursuant to  3553(a). A just sentence, upon consideration of Mr. Owen's childhood, interrupted by: poverty, violence, abandonment, instability, gangs and drugs, requires a significant downward variance.

## Violence and Gangs

Mr. Owen reports that at the time of his arrest his connection to the Rollin Crips was minimal. His co-defendants were known to him as much for the fact that they lived in and around his neighborhood as opposed to any alleged gang affiliation. He describes that "gangs were not like they are today." They were more relaxed and allowed for socialization and protection in his neighborhood.[15"] Growing up in a neighborhood that was violent, drug-infested and had a high level of gang involvement left him at great risk to be recruited.

> *Exposure to violence is a national crisis that affects approximately two out of every three of our children... the exposure of children to violence is a uniquely traumatic experience that has the potential to profoundly derail the child's security, health, happiness, and ability to grow and learn — with effects lasting well into adulthood. Even after the violence has ended, these child survivors suffer from severe problems with anxiety, depression, anger, grief, and posttraumatic stress that can mar their relationships and family life and limit their success in school or work, not only in childhood but throughout their adult lives.*[16]

---

[11] See Urban Institute  "Child poverty and Adult success" Caroline Ratcliff, 2015
https://www.urban.org/sites/default/files/publication/65766/2000369-Child-Poverty-and-Adult-Success.pdf,
[12] See Exhibit A (mitigation Report)
[13] Negative Adult influences and the protective effect of Role Models: A study with Urban Adolescents. N.M Hurd, M.A. Zimmerman, Y. Xue,  National Library of Medicine, 2010,
[14]  Stevenson, Bryan. Just Mercy: A story of justice and Redemption . New York : Spiegel and Grau, 2015, pg.
[15]  See Exhibit A (mitigation Report)

[16] Report of the Attorney General's National Task Force on Children Exposed to Violence, *Defending Childhood Protect Heal Thrive.*

Mr. Owen reports struggling with anxiety, depression, grief and post traumatic stress. The gang violence that he experienced during his youth you has scarred Mr. Owen permanently; we ask that the Court consider the traumatic experiences that have shaped Mr. Owen's life in issuing a significant downward variance.

## A Sentence No Greater than 240 Months Would Afford Adequate Deterrence to Criminal Conduct.

Deterrence is both general and specific.[17] There is little evidence that long prison sentences have a sufficient general deterrent effect to "justify their social and economic costs."[18] Rather, the general deterrent effect of the certainty of punishment is far more consistent than that of the severity of punishment. A lengthy sentence of imprisonment for Mr. Owen cannot, therefore, be justified on grounds of general deterrence.

Nor is a term of imprisonment greater than 240 months necessary for specific deterrence. A sentence significantly below the guideline range **will** reflect the seriousness of the offense, promote respect for the law and provide just punishment for the crimes for which Mr. Owen was convicted.

Mr. Owen was convicted of participating in multiple acts of violence directly and indirectly. Count 1 and its attended sentencing enhancement allege that by Mr. Owen simply stating the "the opps are out on Morrison" he set in motion a series of separate and intentional acts by Richard Feliz, that ultimately led to Richard Feliz shooting and killing Victor Chafla. The shooter Mr. Feliz was sentenced to 340 months[19]. On the other end of the spectrum Mr. Nathaniel Rodriguez and Shaquille Bailey both testified to multiple crimes that they committed as members of the Rollin 30's. Mr. Rodriguez went as far to testify coldly about a murder attempt, he had plotted[20] and, to admit without reservation he is a predator.[21] Mr. Rodrigues was sentenced to time served and was incarcerated for a period of approximately 31 months and 9 days.[22] Mr. Bailey was sentenced to time served was incarcerated for a period of less than 4 years.

To avoid unwarranted disparity in sentencing Mr. Owen's sentence should be significantly below that of Mr. Feliz. No evidence was produced at trial that alleged Mr. Owen shot and killed anyone.

## Recidivism

Pursuant §3553(a) a sentencing judge must consider "the need for the sentence imposed... to protect the public from further crimes of the defendant." If this Court were to sentence Mr. Owen to a period of 240 months incarceration, he would be nearly sixty-years old at the time of his release. Defendants released at the age of sixty had a 16% rate of recidivism.[23] The defendant would pose little to no risk of harm to the community. Multiple factors influence the likelihood of recidivism, such as: employment history,

---

(December  12, 2012).

[17] See Furman v. Georgia, 408 U.S. 238, 343, 92 S. Ct. 2726, 2779, 33 L. Ed. 2d 346 (1972) ("Our jurisprudence has always accepted deterrence in general, deterrence of individual recidivism, isolation of dangerous persons, and rehabilitation as proper goals of punishment.").

[18] Daniel Nagin, "Deterrence in the 21st Century, Crime and Justice in America: 1975-2005," at 201 (ed. Michael Tonry, University of Chicago Press, 2013)

[19] PSR ₽ 13.

[20] Tr. Pg. 665, line 22 - pg. 669, line 21.

[21] Tr pg. 713, line 11-20.

[22] PSR ₽ 13.

[23] USSC, Recidivism Among Federal Offenders: A Comprehensive Overview (Mar. 2016), at 23, fig. 11.

criminal history, responsibilities, and family ties[24]. Mr. Owen maintained steady employment with ServePro construction company for eight years.

Moreover, after speaking with the mother of his children on multiple occasions, it is crystal clear that Mr. Owen has support from his family and financially supported his daughter. Indeed, the "single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return." [25]Mr. Owen enjoys a very healthy relationship with the mother of his and two children. In fact, he is extremely close to his family. He has a strong connection with his daughter Zoe. These qualities and indicators foretell that Mr. Owen upon his release would not be a danger to the community.

As noted in the Pre-sentence report Mr. Owen has zero criminal points. Offenders with zero criminal history points are the least likely to reoffend, with only 30.2% reoffending within eight years.[26] The study demonstrates that recidivism rates decline relative age increases.

**Below Guidelines Sentence Due To COVID-19**

Prison, in the United States, is supposed to be punishment but humane. In the last two and a half years, it has been crystal clear that the prisons in the United States were not prepared for COVID, have not adequately adapted to COVID and quite frankly have been places replete with substandard, inhumane conditions.

There can be no doubt that March 2020, the month COVID-19 became a reality in this Country, forever changed incarceration for defendants in the United States. The measures necessary to slow the progress of the disease – social distance, masks, adequate hygiene – were and still are impossible inside a prison. Crowded into small areas, communal dining, sleeping in close quarters, toilets shared by dozens of inmates, phones passed from one inmate to another, shared computers, no sanitizing wipes, limited soap and cleaning products are rampant in prisons across the United States.

Due to COVID-19, jail conditions which were objectively harsh anyway, became even more harsh. In most BOP facilities, the prisoners are still facing significant 24 hour or 23.5 hour lockdowns for months at a time due to COVID outbreaks or just random issues within the jail. In New York City, MDC and other local jails have not been spared. We also wholeheartedly agree with Judge Oetken's assessment in _**United State v. Daniel Gonzalez, 18 Cr. 669, (JPO), 4/2/21, Dkt 249 stating in sum and substance that time served during COVID should count at least 1.5 to 2 times actual time.**_

Mr. Owen has been incarcerated since September 13, 2017. On the day of his sentence, he will have served 4319 days incarcerated collectively: at the Metropolitan Correctional Center (MCC), Metropolitan Detention Center (MDC), and the Westchester County Correctional facility (WCC). While we are not seeking a downward departure due to the COVID-19 pandemic, we submit that any incarceratory period for Mr. Owen during this pandemic should warrant a significant downward variance and he should be credited at least

---

[24] See, e.g., Measuring Recidivism at 12, & Ex. 10 (overall recidivism rates decrease with increasing education level, stable employment in the year prior to arrest); "The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures.");
[25] Recidivism and Paternal Engagement by Solangel Maldonado, Family Law Quarterly, Vol. 40, No. 191, 2006, Seton Hall Law School Legal Studies Research Paper No. 2010, .pg. 196-197
[26] USSC, Recidivism Among Federal Offenders: A Comprehensive Overview (Mar. 2016), at 18, fig. 6.

1.5 days for every day of incarceration he has served up to this point. As recently as two weeks ago, Mr. Owen informed me that the WCC was on COVID lock down and that his movements within the facility had once again been severely impacted. Since he has been at WCC he has experienced well over four COVID lockdowns. Indeed, several Courts have reduced sentences based on the pandemic and unduly harsh pretrial conditions of detention.[27]

To be sure, the future in the penal system does not look bright for inmates until this Country has complete control over COVID and quite frankly better control of how the BOP treats it prisoners.  In this case, the inhumane conditions that Mr. Owen has faced over the four years and ten months warrant a significant downward variance.

## Defense Objections

The defense objects to probation's sentencing guideline calculation. On January 18, 2022, Counsels for Mr. Torres and Mr. Owen submitted a joint objection to the use of murder for the calculation of Mr. Torres and Mr. Owen's base offense level. The Court has not ruled on defense objection as of the filing of this sentencing submission. We resubmit herein our letter motion objecting to Probation's sentencing guideline calculation.[28]

## Conclusion

Probation recommends a total sentence of 480 months. Probation also concedes that an excessive sentence is unwarranted because Mr. Owen has no prior convictions and did not directly cause the death of anyone. We believe that a sentence of 480 months is excessive and would be greater than necessary to fulfill the goals of sentencing pursuant § 3553(a). We respectfully request that the Court impose a sentence of up to 240 months, as a sentence sufficient but not greater than necessary to meet the goals of justice pursuant to § 3553(a). Mr. Owen respectfully reserves the right to raise additional issues at the time of his sentencing.  The Court's time and consideration of this submission is greatly appreciated.

Respectfully submitted,

/S/ *Alain V. Massena*
/S/ *Xavier R. Donaldson*
*Attorneys for Walston Owen*

cc: All Parties via ECF

---

[27] See e.g., *United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) (substantial downward variance from 30 to 37 months to six months in part because of the "horrific conditions" at MCC during the pandemic).[27] *United States v. De La Rosa Sanchezs*, 19 Cr. 863 (VSB),(S.D.N.Y. May 4, 2020)(reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); and *United States v. Pierson*, 14 Cr. 855 (LTS)(S.D.N.Y. May 4, 2020)(same for defendant detained at MDC).
[28] Dkt: 619

Exhibit A

**Nancy M. Tricamo, LCSW**

**Sentencing and Mitigation Specialist**

646-528-4568/ntricamo@mac.com

---

49 West 24th Street – Suite 1006                    71 Valley Street – Suite 301
New York, NY 10010                                  South Orange, NJ 07079

July 5, 2021

Alain V. Massena, Esq.
305 Broadway – Suite 1001
New York, New York 10007

Xavier R. Donaldson, Esq.
Donaldson & Chilliest LLP
1825 Park Avenue – Suite 1102
New York, New York 10035

**Psychosocial Assessment**

Client Name:        Walston Owen
Date of Birth:      November 19, 1983
Docket Number:      0208 1:S8 16CR 809-06 (VM)

**Identifying Data:**

Walston Owen is a thirty-seven-year-old Caribbean-American male who is incarcerated at Valhalla Correctional Facility. He has been detained since his arrest on September 13, 2017. Mr. Owen was convicted following trial of four counts on his indictment, the highest of which was Conspiracy to Commit Racketeering. Mr. Owen was born in Kingston, Jamaica and was raised by several of his family members, including his sister and maternal grandfather. Mr. Owen's mother moved to the U.S. when he was a small child and worked as a home attendant in order to send money home to her family in order to support her children. Mr. Owen moved to the United States in 1999 at the age of sixteen. He attended high school in the Bronx and Connecticut. He reports he attended school until near the end of twelfth grade but does not believe he actually

graduated. Mr. Owen has been employed at various jobs since high school, but his longest employment was for ten years with a demolition company named Servepro. Walston Owen is the father of one child, Zoe Owen, who is ten years old and lives with her mother in the Bronx.  Mr. Owen is in regular contact with his daughter.

Walston Owen was arrested on the current charges in September 2017. He went to trial on this case and on February 24, 2020, he was convicted on Counts 1 through 4 of his indictment. Mr. Owen's guidelines place him at a level 43 with a Criminal History Category of zero.  Mr. Owen faces the possibility of a life sentence as a result of his guideline range.

**Introduction:**

This evaluation was completed at the request of Mr. Owen's attorneys, Mr. Alain Massena and Xavier Donaldson. The reason for this referral was to conduct a psychosocial evaluation that discussed Mr. Owen's history and the mitigating factors related to his criminal behavior.  Mr. Owen was cooperative and in agreement with this evaluation. Interviews with Mr. Owen were conducted remotely from the Valhalla Correctional Center where he is housed. In addition to these interviews, relevant legal documents were reviewed, and research was conducted on Mr. Owen's behalf in order to complete this evaluation.

The focus of this report will not be the charges against Walston Owen. Instead, this report will focus on Mr. Owen's unique personal history, his lack of any criminal convictions or arrests that were not dismissed prior to this case, his role as a father, his adjustment as a prisoner and his exemplary work history. This report is asking for leniency for Walston Owen based on these factors.

**Family Background and Developmental History:**

Walston Owen was born on November 19, 1983, in Jamaica, West Indies. He is one of two children produced by the union of Gloria Osborne and Ralston Owen. He has an older brother, Paul Owen, who lives in the Bronx and Walston reports being very close to.  Mr. Owen has four maternal half-siblings, three of which he is not close with and one, Jack Middleton, who he was close with when living in Jamaica. Jack passed away about six years ago, for unknown reasons. Mr. Owen reports that his brother "went to sleep and didn't wake up." The remaining siblings, Lisa Mills, Roy (unknown last name) and Cherry Jones are all living in Jamaica, and he has no contact with them. He also reports that Cherry, who he has never met, is developmentally disabled and cannot function independently.

Mr. Owen reports that his parents were married, and remained together for about four years, separating when his mother was pregnant with him. Following his birth in Jamaica, his mother relocated to the United States for work. When his mother left

2

Jamaica, Mr. Owen began a long journey of moving to many different homes, including his father, one of his older sisters, and his maternal grandfather. He remembers speaking to his mother once every few months, but not feeling connected to her during most of his childhood. As is a common practice in many cultures, Ms. Osborne relocated for work and worked diligently as a home attendant in the U.S. in order to support her children, sending money regularly to Jamaica for their care. The first time Walston remembers meeting his mother was when he was seven years old. She had traveled to Jamaica to attend a court case for one of his brothers. He then didn't see her again until he was sixteen, and she returned to Jamaica again for a court case of a sibling. Not long after this visit, Walston relocated to the United States to live with his mother. Since this time, he has mostly remained a resident of her home in the Bronx.

Walston Owen describes his childhood as challenging and difficult primarily due to living in poverty. No matter where he was living, there was often not enough money available for basic necessities, including food and clothing. In several of the homes he lived in, there was not running water or phone lines to contact his mother. Additionally, Mr. Owen also reports many of the communities he lived in were overrun with violence, drugs, and gang activity. At the age of sixteen, his family decided to move him from Jamaica to the Bronx in order for him to have more opportunities and to escape the criminal influences in Jamaica.

When he arrived in New York, Mr. Owen moved in with his mother and her then boyfriend, Ronald Phin. Mr. Owen received little help or guidance when he came to New York. His mother did register him for school, but she worked very long hours and was not at home to supervise or care for him. He does state that Mr. Phin was home more often, and they had a decent relationship, but there was no expectation that Mr. Phin would be his caretaker. Instead, as he had most of his life, Mr. Owen took care of himself.

When he arrived in the U.S., Mr. Owen was enrolled in the ninth grade at Monroe Academy for Business and Law in the Bronx, New York. This school is now closed and insideschools.org states this about its history:

> *Historic James Monroe High School closed in 1994 because of poor performance and was replaced by several small high schools. The building is now known as the Monroe Educational Campus. Unlike newer small schools created under the Bloomberg administration that partner with outside organizations and receive extra start-up funding from the Department of Education, the original Monroe Campus schools opened with little vision and even fewer resources. The original small schools floundered, unable to overcome the same challenges that led to the demise of Monroe High School: high numbers of students living in poverty, unable to read at grade level and learning English as a second language. Today, only one of the original Monroe Campus schools is still open and accepting new students:*

> *Monroe Academy for Visual Arts & Design. Another, the Monroe Academy of*
> *Business / Law closed in 2014 after years of low attendance and graduation rates.[1]*

Once again, Mr. Owen was faced with considerable challenges in his environment. He attended this school for two years. During this time, he witnessed a great deal of violence in his neighborhood and learned about various gangs within his community. Not long after he started school, Mr. Owen was recruited into the Rollin' 30's, a sect of the Crips gang. Mr. Owen remembers this decision being influenced by the consistent presence of violence in his community and wanting protection from these threats.  The U.S. Department of Justice outlined the risk of gang involvement as often involving some of the following factors:

> *They found that risk factors span all major risk factor domains: community, family,*
> *school, peer group, and individual characteristics. The most important community*
> *factor is growing up in neighborhoods in which drugs are readily available. Several*
> *family variables are important: family instability, extreme economic deprivation,*
> *low attachment to the mother, family management problems, family conflict,*
> *parent proviolent attitudes, and sibling antisocial behavior. Numerous school*
> *factors are very important, including low educational aspiration, low commitment*
> *and attachment to school, low achievement test scores, identification as being*
> *learning disabled, and low grades. [2]*

Looking back on this time, Mr. Owen states "gangs were not like they are today." They were more relaxed and allowed for socialization and protection in his neighborhood. Growing up in a neighborhood that was violent, drug-infested and had a high level of gang involvement left him at great risk to be recruited. This was the time when Mr. Owen met several of the codefendants on his case. In 2012, the U.S. Attorney General's task force on Children Exposed to Violence reported a connection between children exposed to various forms of violence (domestic violence, physical abuse, community violence and parental neglect) and interference with the healthy development of these children, such as Mr. Owen:

> *Exposure to violence is a national crisis that affects approximately two out of every*
> *three of our children. Of the 76 million children currently residing in the United States,*
> *an estimated 46 million can expect to have their lives touched by violence, crime,*
> *abuse, and psychological trauma this year. In 1979, U.S. Surgeon General Julius B.*
> *Richmond declared violence a public health crisis of the highest priority, and yet 33*
> *years later that crisis remains. Whether the violence occurs in children's homes,*
> *neighborhoods, schools, playgrounds or playing fields, locker rooms, places of*
> *worship, shelters, streets, or in juvenile detention centers, the exposure of children to*
> *violence is a uniquely traumatic experience that has the potential to profoundly derail*

---

[1] https://insideschools.org/school/00Z022

[2] https://www.ojp.gov/pdffiles1/ojjdp/171154.pdf

*the child's security, health, happiness, and ability to grow and learn — with effects lasting well into adulthood.  Even after the violence has ended, these child survivors suffer from severe problems with anxiety, depression, anger, grief, and posttraumatic stress that can mar their relationships and family life and limit their success in school or work, not only in childhood but throughout their adult lives. Without services or treatment, even children who appear resilient and seem to recover from exposure to violence still bear emotional scars that may lead them to experience these same health and psychological problems years or decades later.[3]*

Walston Owen reports struggling with many of the symptoms described in this report and continues to experience some of these symptoms to date.

Once Mr. Owen's mother realized the negative influences her son was exposed to at school, and the increasing violence in their community, it was decided that Walston would move in with his father who was then living in Connecticut. Once there, he enrolled in Winchester High School and completed most of twelfth grade but does not know if he earned enough credits for graduation because he left before the end of the school year.

When Mr. Owen moved to Connecticut with his father, he describes it like moving in with a stranger. He had very little contact with his father up until this point and even after moving in, his father did not spend quality time with him. Mr. Owen states that his relationship with his father was always driven by him reaching out and encouraging them to get together. He moved back to his mother's home in the Bronx at the age of nineteen and decided if his father wanted to have a relationship with him, he would have to make an effort to do so. His father made no such efforts, and Mr. Owen has not spoken to him since this time. He believes he is now living in Jamaica, but is not sure.

Abandonment was a predominant theme in Walston Owen's life. His mother left him in Jamaica shortly after he was born to move to the U.S. for work. She did send money for him and visited a few times, but he did not really know her until he was sixteen. He lived with his father as an infant in Jamaica, but his father also left him to relocate to the U.S.  The bonding between a parent and child that often develops during the early years never happened for Walston. Once he relocated to the U.S., Mr. Owen was once again left to take care of himself due to his mother's job responsibilities. The short time he spent with his father in Connecticut was the last time they had any contact.  His parents were never able to provide a consistent and structured home for Mr. Owen.  Instead, his parents were in the periphery of his life and abandoned him when he needed them most. In a study conducted by the National Center for Biotechnology Information, the following is stated:

---

[3] https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf

> *Collectively, our findings indicate that role models can help adolescents overcome the risk they face by being exposed to negative non-parental adult behavior. Although role models played different roles for different adolescent psychosocial outcomes, overall, the results support resilience theory. Having someone to look up to appears to be an asset for adolescents. Our findings are consistent with the notion that adults may be vital resources to help protect youth from the noxious effects of risk they face (Fergus & Zimmerman, 2005).[4]*

When asked to think of someone he looked up to during his childhood, Walston struggled to come up with anyone. During his formative years, Mr. Owen was tragically alone.

Upon his return to New York from Connecticut, Mr. Owen ran into Randy Torres, a member of the Rollin' 30's. Mr. Torres asked him at the time if he was still "involved" and Mr. Owen said he had "retired." He wanted to focus on work and getting his life together. Years later, in 2015, Mr. Owen discovered Mr. Torres lived near where he was working. They started to socialize again and did so consistently until they were both arrested on the present charges.

Prior to his arrest, Mr. Owen had a lengthy history of employment. He began doing construction work, mostly as an apprentice electrician. In 2009, his brother Paul, who had relocated to the U.S. and was also living with their mother, got him a job where he worked. The company is named Servpro, and is a construction, restoration and demolition company in Westchester. Mr. Owen was employed there until he was arrested in 2017. He maintained this employment consistently for eight years and was a valued employee.

When he was twenty-nine years old, Walston Owen married Unique Marshall. They lived together at his mother's home, but his mother and Unique did not get along. Over the years, the friction between his mother and wife caused the relationship to deteriorate. The couple eventually divorced. In 2012, Mr. Owen became involved with Ebony Brown. They were in a relationship for several years and had a child together, Zoe Owen, who is ten years old. They are no longer together but are raising their daughter together.

When Mr. Owen spoke about his daughter, it was obvious how much he enjoyed being a father. Although he did not remain in a relationship with Ms. Brown, he was always a consistent presence in Zoe's life. Ms. Brown confirms Mr. Owen provided regular financial support and is an excellent father, always seeing his daughter as often as possible. Mr. Owen continue to speak to his daughter when he can and misses her terribly.

---

[4] http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2752426/

**Sentencing Recommendation:**

Walston Owen is due to be sentenced in mid-July. The probation department's guidelines place Mr. Owen at a guideline level of 43 and are recommending a life sentence. Based on Mr. Owen's history and the fact that he has no criminal record, the defense respectfully requests leniency in sentencing, allowing Mr. Owen to eventually return to his family and gainful employment.

Due to his mother moving to the states in order to provide financial support for her children, Walston Owen moved around several times throughout childhood and never had a stable home. In addition, despite his mother's efforts, the people who cared for him often did not have enough money to provide him with basic necessities. Once he reunited with his mother, she was still working long hours and was not able to provide much supervision. This left Mr. Owen vulnerable to being recruited into the gangs that were present in his neighborhood. Trying to get him on a new track, Walston moved to Connecticut to live with his father, but once again, the adult in his life was not able to show up and provide the structure and support that he needed. After almost a year in Connecticut, Mr. Owen returned to his mother's home and never spoke to his father again. When he returned to New York, Mr. Owen returned to his social circle, some of whom were still involved in gang-related activities.

**Conclusion:**

The conviction in this case is Mr. Owen's first. He has a lengthy work history and was employed at the same company for many years prior to his arrest. He has supported his daughter since she was born and the people in his life were all shocked when he was arrested and charged with such serious crimes. He is not a disciplinary problem in jail and Mr. Owen is not a defendant with no possibility of redemption, deserving of a life sentence.

In considering the applicable guideline range and Sentencing Commission policy statements pursuant to 18 U.S.C. § 3553(a)(4) and (5), we urge the Court to take into account the fact that there are mitigating factors in Mr. Owen's background and in his personal circumstances previously described in this presentation, which argue in favor of a sentence that does not just focus on Mr. Owen as a violent offender but allows the Court to provide him leniency in sentencing. In the interest of justice, compassion and punishment, the defense feels leniency in sentencing for Walston is appropriate.

We thank the Court for it's consideration of this report.

Respectfully submitted,
*Nancy Tricamo*, LCSW
Mitigation and Sentencing Specialist

Exhibit B

# LAW OFFICE OF SAM A. SCHMIDT

**29 BROADWAY Suite 1412**
**NEW YORK, N.Y. 10006**
**(212) 346-4666**
**facsimile (212) 346-4668**
**lawschmidt@aol.com**

Sam A. Schmidt, Esq.

January 18, 2022

Honorable Victor Marrero
United States District Court Judge
500 Pearl Street
New York, NY 10007

Re: *United States v. Randy Torres*, et al
   16 Cr. 809 (VM)

Dear Hon. Judge Marrero:

Pursuant to this Court's order, this letter is submitted as a joint objection of the calculation of the Guideline range for Randy Torres and Walston Owen. The legal issues of the defendants may be shared but the factual issues are not.

## The Maximum Sentence Permissible is Twenty (20) Years

Notwithstanding the offense alleged in the Special Sentencing Enhancement provision was entitled "Murder in the Second Degree" the elements of the offense, the proof of the offense and the significance of the jury determination was that generically, the offense committed was voluntary manslaughter. Therefore, the jury only found Randy Torres and Walston Owen guilty of a generic voluntary manslaughter, for which the maximum sentence is 20 years.

The title given by the State of the offense has no significance at to whether or not an offense is a racketeering act. *United States v. Nardello* 393 U.S. 286, 295 (1969) ("the inquiry is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged.") For a State offense to be a listed racketeering act, minimally, like the categorical approach, it must meet the generic definition of the stated crime. *See Taylor v. United States* 495 U.S. 575 (1990), *United States v. Davis*, 139 S.Ct. 2319, 2326-29 (2019); *United States v. Acosta*, 470 F.3d 132, 134 (2d Cir. 2006); *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018). The offenses and proof presented in the instant case is not a generic murder and cannot be considered an "act or threat constituting murder."

The categorical approach requires that the elements of the State offense match the generic version of the offense in all ways. Thus, if the offense could be committed in a manner broader than the generic offense, then the State offense is not a match. While most of the decisions concerning the need for the offense to be generic crimes relate to prior convictions enhancing sentences, the Supreme Court and the Second Circuit have made it clear that the categorical approach applied to conduct being litigated at trial as for whether an offense is a crime of violence for the determination necessary for a conviction for 18 U.S.C. § 924(c). See *United States v. Davis,* 139 S. Ct. 2319 (2019) , *United States v. Barrett*, 937 F.3d 126, 127 (2d Cir. 2019); *United States v. Heyward*, 3 F.4th 75, 81 (2d Cir. 2021).

1

The federal murder statute and generic murder requires malice aforethought. See e.g. *United States v. Slager*, 912 F.3d 224, 236 (4th Cir. 2019) (Murder is "the unlawful killing of a human being with malice aforethought," and 18 U.S.C. § 1111.) There are many ways the courts have tried to define "malice aforethought." For the crime of intentional murder, the dissent noted in *Patterson v. New York*, 432 U.S. 197, 217 (1977), "in practice a finding that the killing was committed with malice aforethought had come to mean simply that heat of passion was absent."

Indeed, in its February 20, 2020 response to Mr. Torres' motion to strike murder as a predicate racketeering act and the Notice of Special Sentencing Factors, the government acknowledged that malice aforethought required the "absence of extenuating circumstances" relating to the mental state that was required for a finding of malice aforethought. Acting in the heat of passion or as a result of provocation are considered extenuating circumstances.

For the federal murder statutes and for generic murder, when considering the necessary *mens rea* for intentional murder, it is an element for the prosecution to prove that the defendant being held responsible was not acting in the heat of passion or as a result of provocation. Without such a finding by the jury it is not murder under federal law nor is it a generic murder. It is voluntary manslaughter.[1] Thus, the finding that Randy Torres or Walston Owen committed the offense of Murder in the Second Degree as a Special Sentencing Factor is not a finding that either committed the offense of generic murder sufficient to increase the maximum sentence from twenty years to life imprisonment.[2]

**The Base Offense Level Should Be Based Upon § 2A1.3 and Not § 2A.1 or § 2A.2**

Paragraph 43 of the PSR correctly notes that the base offense level for the offense of a conviction under 18 U.S.C. § 1962(d), should be determined by USSG §2E1.1. For State offenses, application note 2 requires that the "most analogous federal offense is to be used." The PSR wrongly determined that murder in the first degree was the most analogous federal offense.

To determine the most analogous federal offense here, one must compare to the elements of the relevant federal statute with the elements of New York's Murder in the Second Degree under NYPL § 125.25(1). When compared, it becomes clear that the State offense does not require all of elements required by federal statues for intentional murder either in the first or second degrees.

---

[1]     Even in the states like New York that do not require proof of malice aforethought initially, when the defense appropriately raises the issue of extreme emotional disturbance, such as being stabbed in the back two times, the court is required to instruct the jury as to extreme emotional disturbance as an affirmative defense. That it initially needs to be raised by the defense should be of no moment because other traditional defenses, such as justification or self defense, must first be properly raised before the court instructs the jury on that defense.

[2]     While New York does not require proof of malice aforethought, *Patterson v. New York*, 432 U.S. 197, 198 (1977), it appears that the Government sought a grand jury finding of malice aforethought because, under the Sentencing Guidelines, offense levels for predicate RICO acts and violent crimes in aid of racketeering under 18 U.S.C. § 1959 alleging state-law crimes are calculated using "the offense level corresponding to the most analogous federal offense." U.S.S.G. § 2E1.1 application note 2; Id. § 2E1.3 application note 1. Both first-degree and second-degree murder under federal law require proof of malice aforethought, as opposed to manslaughter, which requires no such showing. *United States v. Gotti* 2004 WL 2389755 *5.

Both first and second degree murder requires that the "unlawful killing of a human being [is] with malice aforethought" is proven beyond a reasonable doubt. First degree murder also requires proof beyond a reasonable doubt of premeditation. New York Murder in the Second Degree, as reflected in both the Indictment and Your Honor's jury charge, does not include the elements of malice aforethought nor premeditation. Specifically, the instructions to the jury on the intent to murder was clear, "intent does not require premeditation." Tr. 2123:14-20.

In *United States v. Mulder*, 273 F.3d 91, 117 (2d Cir. 2001) the Second Circuit found that federal first degree murder required the element of premeditation. It cited *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir.1983) where the "the court noted that the distinction between first degree and second degree murder was 'less than clear' but that 'the best that can be said of deliberation is that it requires a 'cool mind' that is capable of reflection, and of premeditation that it requires that the one with the 'cool mind' did, in fact, reflect at least for a short period of time before his act of killing.'" *Mulder,* 273 F.3d at 117.

The federal voluntary manslaughter section, on the other hand, is the killing of another without malice "[u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). *See United States v. Walters*, 775 Fed. Appx. 25, 27 (2d Cir. 2019) citing *United States v. Steward,* 880 F.3d 983, 987 (8th Cir. 2018) ("voluntary manslaughter functions . . .like a partial defense to murder,") , and *United States v. Velazquez*, 246 F.3d 204, 212 (2d Cir. 2001) ("requires a mental state that would be malice except for heat of passion or provocation . . .") See also *United States v. Slager,* 912 F.3d 224, 236 (4th Cir. 2019) (Murder is "the unlawful killing of a human being with malice aforethought," 18 U.S.C. § 1111, whereas voluntary "manslaughter is the unlawful killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion,' 18 U.S.C. § 1112(a). Thus, the first or second degree murder Guideline section requires that "malice aforethought" would have to be one of the elements found by the jury beyond a reasonable doubt. See *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). It was not.

The fact that the actual shooter may have acted with malice aforethought and premeditation is irrelevant in the determination of Mr. Torres' mental state at the time he said "get the grip" immediately after he (and "Star") were stabbed in the back.[3] As Your Honor instructed the jury, "[t]he intent can be formed and need only exist at the very moment the individual engages in prohibited conduct or acts to cause the prohibited result." (See Tr. 2123:17-19). It is Mr. Torres' mental state at that time that determines his culpability and not the shooter's. Further, it is clear that under New York law the principal and the accomplice may have different culpable mental states and therefore be guilty of different offenses. When "the offense committed is divided into degrees, each person, the principal and the accomplice, is guilty of such degree as is compatible with his own culpable mental state and with his own accountability for an aggravating fact or circumstance" *New York Penal Law § 20.15. See People v. Castro*, 55 N.Y.2d 972, 449 N.Y.S.2d 184, 434 N.E.2d 253

---

[3]        As noted in the PSR at footnote 2, page 20, and at page 27, the testimony was that he told "Fly" and Richardson to get the grip (gun) and did not say "and shoot members of the CHC."

(1982).[4]

Should the government argue that in order to determine the analogous federal offense to New York's Murder in the Second Degree offense, Your Honor should make his own factual findings as to the offense conduct, the result is the same. Though we dispute the need for further fact finding, the evidence presented during the trial it is clear that the offense found to be proven for the Special Sentencing Enhancement is neither the federal offenses of murder in the first nor second degrees. However, in determining the appropriate sentence under 18 U.S.C. §3553, Your Honor certainly has the authority, even the obligation, to consider the testimony, exhibits and other appropriate submissions as to Mr. Torres character and culpability.[5]

The trial evidence relating to Mr. Torres' *mens rea* relating to Nester Suazo's death clearly demonstrates that he lacked premeditation, was the result of provocation and was in the heat of passion. Neither Mr. Torres nor any of his companions arrived at the video shoot organized by Shaquille Bailey with any weapons nor sought to participate in any violent conduct. While at trial the cooperators claimed not to remember much of the circumstances that led to the fight that ultimately resulted in Mr. Suazo's death, their 3500 material, reflecting their memories shortly after their arrests, show otherwise. Mr. Bailey recalled that "Caliber" tried to go after Nathaniel Rodriguez two times before the video shoot but that Mr. Torres intervened to stop it. It was "Caliber" that then started a fight with Mr. Torres, during which Gem Campbell, aka "Spaz" stabbed "Star" and then stabbed Mr. Torres in the back two times. It was at that time the witnesses said that Mr. Torres told "Fly"and Derrick Richardson to "go get the grip." (See 3501-01 page 9 for Bailey's statements and 3522-11 page 12 for Rodriguez's statements and his testimony Tr. 488). There was no testimony that Mr. Torres did anything else to aid or abet the shooting of Mr. Suazo. In fact, his conduct after his request to "Fly" and Mr. Richardson demonstrates his lack of interest of shooting anyone.

The videos of the events at the bodega, Government's Exhibits ("G-EX") 291-293, show when Mr. Torres saw Mr. Suazo inside a bodega, he immediately confronted Mr. Suazo and punched him 1 or 2 times and then left the bodega thereby demonstrating no further interest in doing harm to him. Outside the bodega, Mr. Torres is seen standing next to "Spaz," the woman who stabbed him with no indication that he sought to harm her. Instead he ran down the block where it appears further fisticuffs were taking place.

---

[4]     "With respect to a culpable mental state, a jury, for example, may reasonably hold a defendant guilty of murder on finding that the defendant acted with a specific intent to kill, and hold the co-defendant guilty, as an accomplice, of manslaughter on finding that the co-defendant intended only to cause serious physical injury." N.Y. Penal Law § 20.00 (McKinney Practice Commentary).

Since New York law does not require malice aforethought or premeditation as an element of its murder in the second degree statute, that the accomplice acted in the heat of passion and without premeditation and the principal did not act in the heat of passion but with premeditation would not be recognized as different mental culpabilities except if the accomplice was able to demonstrate and prove he acted under extreme emotional disturbance. However, under the federal murder statutes, heat of passion and premeditation are elements that are required to be disproved beyond a reasonable doubt.

[5]     In a separate submission, counsel will discuss Mr. Torres' and Mr. Owen's background and character in greater detail. Counsel for Mr. Torres will also need to respond to his characterization in the justification section of the final PSR that is not accurate. (See PSR Page 32 ¶ 1).

Unfortunately, soon thereafter, Mr. Suazo exited the bodega and ran towards the same melee. Moments after he arrives at the location, a person arrived at the melee and immediately fired a gun. There is no evidence at all that Mr. Torres did anything further than tell "Fly" and Mr. Richardson to "get the grip" immediately after both he and "Star" were stabbed.

Therefore, counsel for Mr. Torres believes the appropriate section to determine the base offense level is §2A1.3, voluntary manslaughter, which would re-calculate Mr. Torres' base offense level to 29. With the additional role adjustment of a four (4) level increase under §3B1.1(a), the appropriate total offense level should be 33, with a range for Mr. Torres is of 135-168 months instead of the range indicated in the PSR of life.

As for Mr. Owen, the evidence adduced at trial in relation to his role in the shooting of Victor Chafla does not support a *mens rea* reflective of premeditation. The evidence presented at trial relayed that On March 26, 2015, Mr. Owen provided information to co-defendant Richard Feliz aka "Dirt" regarding the whereabouts of a rival crew member. Co-defendant Christopher Domena testified that Richard Feliz informed him that Mr. Owen called Mr. Feliz and stated that "the opps was out there on Morrison." (See Tr. 1438:8). In as much as the jury credited the testimony of Mr. Domena, the statement "the opps was out there on Morrison" does not convey a mens rea of malice aforethought to Mr. Owen. Whereas, a petit jury could reasonably infer that the methodical actions of Mr. Feliz are consistent with a *mens rea* evincing malice afterthought, the same cannot be said for Mr. Owen. Mr. Owen did not retrieve a handgun from Maxie's apartment closet (see Tr. 1439) Mr. Owen did not travel to Morrison Avenue and lie in wait for a rival member to appear on Morrison Avenue (See G-EX 235). And lastly, Mr. Owen did not possess a firearm on March 26, 2015, shoot at a rival gang member and strike Mr. Chafla an innocent bystander. (G-EX 235). Mr. Feliz's actions on March 26, 2015, may reasonably lead a juror to conclude that his actions were premeditated. However, Mr. Owen's purported statement "the opps are out on Morrison" cannot reasonably be interpreted to reflect a *mens rea* of malice aforethought.

Therefore, counsel for Mr. Owen believes that the appropriate section to determine the base offense level is §2A1.3, voluntary manslaughter, which would re-calculate his base offense level to 29. With the additional role adjustment of a three (3) level increase under §3B1.1(a), the appropriate total offense level should be 32, with a range of 121-151 months instead of the range indicated in the PSR of life.[6]

Respectfully,
/s/
Sam A. Schmidt and Andrew Bernstein
for Randy Torres

Xavier Donaldson and Alain Massena
for Walston Owen

---

[6]   For Mr. Torres the guideline range for second degree murder would be level 42 with a Guideline range of 360 months to life, based upon base offense level of 38 plus 4 for leadership role. For Mr. Owen, the offense level would be 41, base offense level 38 plus 4 for leadership role.