

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 15, 2022

**BY ECF**

The Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Randy Torres, Walston Owen, and Charles Ventura, a/k/a "Gutta,"*
             S8 16 Cr. 809 (VM)

Dear Judge Marrero:

      The Government respectfully submits this letter in advance of the sentencing hearing for defendants Randy Torres, a/k/a Rico ("Torres"), Walston Owen, a/k/a "Purpose," a/k/a "Purp," ("Owen"), and Charles Ventura, a/k/a "Gutta" ("Ventura" and, collectively, the "Defendants"), which is scheduled for September 22, 2022. On February 24, 2020, Torres, Owen, and Ventura were convicted following a jury trial before Your Honor. As established at trial, each one of the Defendants held a leadership role in Rollin' 30s, a subset of the nationwide Crips street gang, and each one of the Defendants was personally responsible for heinous acts of violence, as well as acts they enabled through their participation in the Rollin' 30s Enterprise. In light of all the relevant circumstances, for the reasons set forth below, the Government respectfully requests that the Court impose a sentence of no less than 40 years' imprisonment for Torres and Owen, and no less than 25 years' imprisonment for Ventura.

## Background

    **A.  The Offense Conduct**[1]

      The charges in this case arose out of a years-long investigation conducted by the New York City Police Department ("NYPD") and the Department of Homeland Security, Homeland Security Investigations ("HSI"). In the course of the investigation, NYPD and HSI discovered that each of the Defendants occupied a leadership role in the Rollin' 30s (also referred to as the "Rich Rollin'

---

[1] The Offense Conduct is drawn from the same section in each Defendant's Presentence Investigation Report or, where noted, from testimony at trial. *See* Torres Presentence Investigation Report ("Torres PSR"), Dkt. No. 542, ¶¶ 15-23; Owen Presentence Investigation Report ("Owen PSR"), Dkt. No. 543, ¶¶ 17-25; Ventura Presentence Investigation Report ("Ventura PSR"), Dkt. No. 539, ¶¶ 15-22.

30s" and "Dirt Gang"),[2] which is a "set," or subgroup, of a violent, nationwide street gang known as the Crips. Its members are known for committing acts of violence, particularly against other street gangs, as well as trafficking drugs and firearms. Indeed, for a person to join the ranks of the Rollin' 30s, that person usually must either commit a violent act that furthers the gang's goals in some way ("putting in work") or be subjected to violence themselves, by being "jumped in"—that is, withstanding a beating for a specified amount of time.

The Rollin' 30s have an organizational hierarchy, with more senior or powerful members being referred to as "OGs"—short for "original gangsters"—and "Big Homies," or "Bigs." That hierarchy is maintained, in part, by requiring members to pay dues (paying the "pot") and by enforcing gang rules and norms through violence and threats of violence (being "C-ripped" or "DP'd").

As noted above, each of the Defendants served as a senior member of the Rollin' 30s. Torres oversaw a number different "lines" of the Rollin' 30s, each rooted in a different neighborhood in New York City and beyond. Torres used aliases (such as "Rico" and "Magneto") depending on which Rollin' 30s set he was interacting with; in his view, this would make it "harder to trace things back to him." (Rodriguez Testimony, Tr. 404-06.) Owen was positioned in the gang directly under Torres and oversaw a particularly violent lineup of the Rollin' 30s centered on Stratford Avenue in the Bronx. As the head of that line, Owen was also referred to as a "Big Homie," whereas Ventura—who was directly under Owen—was a Stratford Avenue "G" or "Gangsta." Though not quite as high-ranking, Ventura was Owen's hand-picked successor, considered by Owen to be "next in line." Prior to their arrest in this case, Owen stated to another gang member that he had chosen Ventura to "take over" Stratford Avenue as Owen stepped up to take over some of Torres's supervisory responsibilities. (Rodriguez Testimony, Tr. 501; Bailey Testimony, Tr. 951.)

It was in these roles—as leaders, organizers, and instigators—that from at least 2009 to 2017, the Defendants, as members of the Rollin' 30s, engaged in a series of violent incidents, motivated in part to protect their territory, to settle internal power disputes, to attack members of other street gangs, and to increase Rollin' 30s members' power, reputation, and influence. As a result of their actions, members of opposing street gangs, other Crips members, and innocent people were shot, maimed, and murdered.

    **1. Randy Torres, a/k/a "Rico"**

Torres described himself as "four levels from the top" of the Crips National leadership. (Torres PSR ¶ 21). The territory over which Torres presided was expansive; neighborhood sets under his control included those in Brooklyn, the Bronx, upstate New York, and Florida. (*Id.* ¶ 21; GX 601Z; Rodriguez Testimony, Tr. 308). In his role as a Big Homie, Torres oversaw the management of literally hundreds of Crips members; he was empowered to order disciplinary action against gang members, including gang beatings, and to collect dues. (*Id.*).

---

[2] The Rollin' 30s gang, which is itself a set of the Crips, is comprised of different subsets, called "lines," including, as relevant here, the "Harlem Mafia Crips," or "HMC" for short; the "Silent Murder Gangster Crips," or "SMC" for short; and the "Certified Harlem Crips," or "CHC" for short.

September 15, 2022
Page 3

When the leader of the Hughes Avenue line of the Rollin' 30s was killed, Torres took over the day-to-day management of the set, including by interjecting himself into local turf battles and overseeing drug dealing. (*Id.*). Torres played an active role in the gang at least until April 2016, when he conducted a drive-by shooting of Philip Wiggin, a/k/a "Pressure." (*Id.*). As the evidence showed at trial, Wiggin was the leader of the Certified Harlem Crips ("CHC"), a Queens-based subset of the Rollin' 30s that had significant conflict with Torres' Harlem Mafia Crips. According to Torres, on the night of that drive-by shooting, another CHC member provided Torres with information about Wiggin's location; Torres obtained a gun from Owen, found Wiggin, and shot him from the back. (Rodriguez Testimony, Tr. 498-500.) Although Wiggin survived, he was shot multiple times. Surveillance video introduced at trial showed that he was unable to get up and laid on the ground bleeding until an ambulance arrived.[3]

Torres' disputes with gang members also led to other acts of violence, including the drive-by attempted murder of Felix Castillo, a/k/a "Spyder," a member of a rival gang, during which two innocent bystanders—Juan Francisco Sierra and a pregnant Larimal Blanco—were shot and injured. That drive-by shooting (perpetrated by Owen, and discussed in more detail below) resulted from a dispute between Torres and Castillo, a rival gang member. Torres repeatedly fanned the flames of this dispute on social media, in conversations with his subordinate members of the Rollin' 30s, and with his own physical actions, such as posing for photographs in Castillo's neighborhood in an effort to taunt his rivals. (*See, e.g.* GX 601-I, 601-M).

Most seriously, the evidence at trial proved that Torres was directly involved in the murder of Nester Suazo, a/k/a "Smacc," a 25-year-old CHC member. (Torres PSR ¶ 20). The day Suazo was murdered, various subsets of the Rollin' 30s, including HMC and CHC, were invited to participate in the shooting of a music video for HMC member (and later cooperating witness) Shaquille Bailey. (*See* Torres PSR ¶ 20). During the shoot, a dispute broke out between the two sets and quickly turned physical. As the fight continued to escalate, Torres was stabbed by another CHC member. (Torres PSR ¶ 20). Torres then instructed two Rollin' 30s, in sum and substance, to get their gun and shoot. (*Id.*) While Torres' two subordinates went to retrieve the gun that had been stashed in a vehicle parked nearby, the melee continued and migrated down the street. Suazo fled into a bodega on East Tremont Avenue and video surveillance introduced at trial showed that Torres followed Suazo into the bodega and personally punched Suazo in the face. (GX 290A). When Torres and Suazo exited the bodega to rejoin the fight that had continued outside on East Tremont Avenue, the two subordinates returned with the gun. They did exactly what Torres ordered them to do, and Suazo—the same person Torres had just been punching moments earlier—was shot and killed. During the indiscriminate shooting, a female CHC member named "Spaz" was also shot; she survived her injuries. (*Id.*). As Rodriguez testified, after this incident, Torres made Rodriguez "thank" the shooter, Derrick Richardson. (Trial Tr. 488).

In May 2018, after the third Superseding Indictment in this case was unsealed, Torres fled New York; he was arrested approximately nine months later, in Florida, working under an assumed

---

[3] Torres' sentencing submission denies his participation in the Wiggin shooting but ignores entirely Rodriguez's corroborated testimony about Torres' own admissions, which were consistent with the video surveillance from the scene.

name as a painter. (Torres PSR ¶¶ 22-23).[4]

### 2. Walston Owen, a/k/a "Purp," a/k/a "Purpose"

Owen was the leader of the Stratford Avenue Rollin' 30s, a violent subset of the Rollin' 30s that fell under Torres' control. As the head of Stratford Avenue, Owen stored guns for the gang, collected money, issued directives to younger or less powerful members, and participated in numerous brutally violent acts of gang violence.

On March 26, 2015, a man named Victor Chafla—an innocent father of seven—was shot by one of Owen's Stratford Avenue Rollin' 30s, a man named Richard Feliz, a/k/a "Dirt." (Owen PSR ¶ 22). Feliz, accompanied by cooperating witness Christopher Domena, had opened fire on a busy street during an attempt to murder rival gang member Aluko Roberts, a/k/a "Luko." Owen called Feliz and told Feliz that the "opps was out there" in a particular location. (Tr. 1438.) Given Owen's status as a Big Homie, Domena understood that to be an order—i.e., that they were to grab a firearm and go try to shoot the "opp"; if they did not, Domena testified that he would have been C-ripped, or beaten, for not following one of Owen's orders. (Tr. 1438.) Feliz and Domena therefore obtained a .40 caliber gun and went to find their target; when they saw Roberts, Feliz fired multiple shots toward him, down a crowded street. The surveillance videos introduced at trial showed that a number of innocent bystanders, including small children, were on the street right around the time of the shooting. Victor Chafla, who had been working at a deli / grocery store and had stepped outside to chat with a co-worker, was struck in the head by one of Feliz's bullets. Chafla died a few days later from his injuries.

On another occasion, Owen drove to pick up cooperating witness Shaquille Bailey. When Bailey entered the vehicle, Owen handed him a gun and told Bailey that he (Bailey) was going to commit a shooting. Owen began driving and as they arrived behind another vehicle, Owen instructed Bailey that Owen would drive their car alongside the other vehicle, at which point Bailey should open fire. At the last second, as Bailey was about to start shooting, Owen told him to stand down because the individual in the other vehicle was not the intended target. Owen revealed to Bailey that he thought he had received information on the whereabouts of Jadon Robinson, the leader of an opposing crew, and that was the reason for the planned shooting. (Tr. 902-904).

Like Torres, Owen's offense conduct was not limited to ordering others to do commit acts violence for the Rollin' 30s. As the jury found, Owen was also the primary perpetrator of the May 14, 2015 drive-by shooting against Felix Castillo, a/k/a "Spyder," which (as noted above) was sparked by Torres. (Owen PSR ¶ 23). During the drive-by shooting, Owen, accompanied by four other members of the Rollin' 30s, fired multiple shots from a .40 caliber gun at Castillo. But Owen missed; instead, he shot two people who had nothing to do with the dispute—Larimel Blanco and Juan Francisco Sierra. Both were seriously injured: Blanco was shot in her lower hip and Sierra was shot in the shoulder and leg and fell into a long coma.

---

[4] Torres asserts that he fled for "safety" reasons. However, during his arrest by Pretrial Services in the Southern District interview, Torres admitted that he had "been on the run for the last ten months." (Torres PSR ¶ 40).

But even that terrible outcome did not dissuade Owen from continuing to engage in violence. Thus, as the jury also found on June 10, 2015, various members of the Rollin' 30s, including Owen, assaulted Luchone Elzey, a member of another opposing crew. At trial, video and photographic evidence was introduced which showed the beating occurred as Elzey casually strolled down a public street in broad daylight. After Elzey had been knocked to the ground and lay prone, Owen gleefully run up and stomped on Elzey's neck and face. This was quickly followed by another member of the Rollin' 30s drawing a razor across Elzey's face, permanently disfiguring him. During the beating, Owen gleefully kicked Mr. Elzey in the head as he lay bleeding on the ground. (GX 271, 271A).

### 3. Charles Ventura, a/k/a "Gutta"

From at least 2009 to 2017, Ventura was a member of the Rollin' 30s street gang. (Ventura PSR ¶ 19). Ventura held a leadership role within the gang, achieving the role of "G," which placed him in the role of lieutenant directly below the rank of "Big Homies" or "OGs," like Owen, and two levels below the "O," Torres. (*Id.*). In his capacity as a "G," Ventura directed the actions of subordinate gang members. (*Id.*) But his status did not prevent Ventura from engaging in a series of violent incidents himself, directed at members of opposing street gangs or crews. (*Id.*) These incidents were motivated in part to protect Rollin' 30s territory, to settle internal power disputes, to attack opposing crew members, and to increase Rollin' 30s members power, reputation and influence. (*Id.*).

Evidence at trial proved Ventura's participation in numerous acts of violence, including shootings in 2009, 2014, and 2017. On April 25, 2009, Ventura participated in an attempted murder on behalf of the Rollin' 30s. (*Id.* at ¶ 20). That evening, Ventura retrieved a firearm from his apartment and began searching the neighborhood for rival Blood gang members. (*Id.*) Ventura travelled to an area controlled by the Bronx River Houses subset of the Bloods gang with whom the Rollin' 30s had an ongoing feud. (*Id.*). Ventura spotted a group of individuals on the street and began firing at them. (*Id.*). Ventura fired approximately six times before fleeing the scene and being caught by law enforcement officers immediately thereafter. (*Id.*). Nobody is believed to have been injured during the shooting. (*Id.*). As a result of committing this attempted murder, Ventura pled guilty to Criminal Possession of a Weapon in the Second Degree, a felony, in Bronx County Supreme Court on May 5, 2009. (*Id.* at ¶ 22).

In approximately 2014, Bailey was shot in the face by Jadon Robinson, the aforementioned leader of the Bronx River Houses subset of the Bloods gang, another opposing crew. Bailey told Ventura what had happened, and Ventura reassured Bailey, "don't worry about it, bro, we got you, get well." (Tr. 867). Ventura subsequently informed Bailey that he had shot at Robinson in retaliation. (*Id.*). Ventura's repeated efforts to shoot at Robinson were corroborated by evidence from Domena, who also testified that Ventura, accompanied by another member from the Stratford lineup, had gone to shoot at Robinson in early 2014.[5,6]

---

[5] Based on the testimony, it is unclear whether Bailey and Domena were testifying about the same or different shootings at Robinson committed by Ventura.

[6] On another occasion in 2015, Ventura was handling a gun when he accidentally fired it and shot Domena in the leg. (Tr. 1454-1455).

On September 6, 2017, Ventura participated in another attempted murder on behalf of the Rollin' 30s. (Ventura PSR at ¶ 21). In connection with the Rollin' 30s' ongoing dispute with the Bronx River Houses Bloods, Ventura travelled to the Bronx River Houses in search of Jadon Robinson. (*Id.*). Ventura opened fire and then fled the scene. During the shooting, Ventura did not hit Robinson, but instead mistakenly shot Collin Bromwell.

Bromwell, a member of the Silent Murder Crips, a Crip set affiliated with the Rollin' 30s, was only at the Bronx River Houses because he was bringing shoes to his daughter. (*Id.*, GX 210, 211). As Bromwell exited the apartment building, he was spotted by Ventura, who thought that Bromwell was Robinson. (Ventura PSR ¶ 21). Ventura, along with at least two other Rollin' 30s, followed Bromwell; Ventura then shot him multiple times. Bromwell survived his injuries, after people in the apartment building nearby called 911 to get help. (*Id.*).

In connection with the September 6, 2017, attempted murder, Ventura illegally possessed Federal .45 Auto cartridges. (*Id.* at ¶ 22). Ventura possessed this ammunition after having been previously convicted of a felony in 2009, as described above. (*Id.*).

### B. The Guidelines Calculation

#### 1. Randy Torres, a/k/a "Rico"

Based on the evidence presented at trial, Torres' applicable Sentencing Guidelines are calculated as follows. Torres was convicted of Count One, racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). The United States Sentencing Guideline ("U.S.S.G.") applicable to that violation is § 2E1.1. Pursuant to U.S.S.G. § 2E1.1, the applicable offense level is the greater of (1) 19, or (2) the offense level for the underlying racketeering activity. The applicable underlying offense is the murder of Nestor Suazo, resulting in on offense level of 43 pursuant to U.S.S.G. § 2A1.1 (Torres PSR ¶ 43).[7] There is a four-level enhancement because of Torres's leadership role in the gang, for an adjusted offense level of 47. (Torres PSR ¶ 46). Pursuant to Chapter 5, Part A of the Sentencing Guidelines, the total offense level is treated as level 43. (Torres PSR ¶ 51). Based on a total offense level of 43 and criminal history score of zero, Probation found, and the Government agrees, that the applicable Sentencing Guidelines Range is life imprisonment. (Torres PSR ¶ 109).

#### 2. Walston Owen, a/k/a "Purp," a/k/a "Purpose"

Based on the evidence presented at trial, Owen's Applicable Sentencing Guidelines are calculated as follows. Owen was convicted of One, racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Pursuant to U.S.S.G. § 2E1.1, the applicable offense level is the greater of (1) 19, or (2) the offense level for the underlying racketeering activity. The applicable underlying racketeering activity consists of four groups: (1) the murder of Victor Chafla on March 26, 2015; (2) the assault and attempted murder of Castillo on May 14, 2015, which resulted in injury to Larimel Blanco and encompasses his conviction on Count 2 (assault and attempted murder in aid

---

[7] For the reasons set forth in the Government's opposition to Torres and Owen's objections to the applicable Sentencing Guidelines, the application of U.S.S.G. § 2A1.1 to the underlying offense conduct for Torres and Owens with respect to Count One is appropriate. *See* Dkt. No. 626.

of racketeering); (3) the assault and attempted murder of Castillo on May 14, 2015, which resulted in injury to Juan Francisco Sierra and encompasses his conviction on Count 2 (assault and attempted murder in aid of racketeering); and (4) the assault on Luchone Elzey on June 10, 2015, which encompasses his conviction on Count 4 (assault in aid of racketeering).  For the first group, the offense level is 46, calculated as follows: pursuant to U.S.S.G. § 2A1.1, the base offense level is 43 and three levels are added pursuant to U.S.S.G. § 3B1.1(b) to account for Owen's leadership status. (Owen PSR ¶ 41).  For the second group, the offense level is 38, calculated as follows: pursuant to U.S.S.G. § 2A2.1, the base offense level is 33, two levels are added pursuant to U.S.S.G. § 2A2.1(b)(1)(B) because Ms. Blanco sustained serious bodily injury, and three levels are added pursuant to U.S.S.G. § 3B1.1(b) to account for Owen's leadership status.[8]  For the third group, the offense level is 41, calculated as follows: pursuant to U.S.S.G. § 2A2.1, the base offense level is 33, four levels are added pursuant to U.S.S.G. § 2A2.1(b)(1)(A) because Mr. Sierra sustained permanent or life-threatening bodily injury, and three levels are added pursuant to U.S.S.G. § 3B1.1(b) to account for Owen's leadership status.  For the fourth group, the offense level is 27, calculated as follows: pursuant to U.S.S.G. § 2A2.2(a) the base offense level is 14, four levels are added pursuant to U.S.S.G. § 2A2.2(b)(2)(B) because a dangerous weapon was used, six levels are added pursuant to U.S.S.G. § 2A2.2(b)(3)(C) because of Mr. Elzey's permanent bodily injury, and three points are added pursuant to U.S.S.G. § 3B1.1(b).  Pursuant to U.S.S.G. § 3D1.4, three levels are added to the group with the highest level because there are two and half units, resulting in an adjusted offense level of 49.  Pursuant to Chapter 5, Part A of the Sentencing Guidelines, the total offense level is treated as level 43.  (Owen PSR ¶ 67).  Based on a total offense level of 43 and criminal history score of zero, the applicable Sentencing Guidelines Range for Counts One, Two, and Four is life imprisonment.  (Owen PSR ¶ 108).

Additionally, pursuant to U.S.S.G. § 2K2.4(b), the Guidelines sentence for Count Three is 120 months' imprisonment, to run consecutively to any other term of imprisonment.  Accordingly, Probation found, and the Government agrees, that the total applicable Sentencing Guidelines Range for Owen for all counts of conviction is life imprisonment, with a consecutive mandatory minimum of 120 months.

### 3. Charles Ventura, a/k/a "Gutta"

Based on the evidence presented at trial, Ventura's applicable Sentencing Guidelines are calculated as follows.  Ventura was convicted of Count One, racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).  Pursuant to U.S.S.G. § 2E1.1, the applicable offense level is the greater of (1) 19, or (2) the offense level for the underlying racketeering activity.  As applicable to Ventura, the underlying racketeering activity consists of two groups: the first is the attempted murder

---

[8]   The Probation Department applied the role enhancement to the first group, but not the three following groups.  The testimony at trial demonstrated that Owen had attained his OG status by the time of the Chafla murder, and maintained that status through the following months when the subsequent racketeering activity occurred.  For that reason, the Government applies the role enhancement to each of the groups.  This does not result in a different total offense level from that of the Owen PSR.

committed by Ventura on April 25, 2009, and the second is the attempted murder committed by Ventura on September 6, 2017, which encompasses his convictions on Counts Five (assault and attempted murder in aid of racketeering) and Seven (being a felon in possession of ammunition). (Ventura PSR ¶¶ 36-37). For the first group, the offense level is 33 pursuant to U.S.S.G. § 2A2.1. (Ventura PSR ¶ 41). For the second group, the offense level is 37 calculated as follows: pursuant to U.S.S.G. § 2A2.1 the base offense level is 33, two points are added pursuant to U.S.S.G. § 2A2.1(b)(1)(B) because the victim suffered serious bodily injury, and two points are added pursuant to U.S.S.G. § 3B1.1(c) because Ventura had a leadership role in the gang.[9] Pursuant to U.S.S.G. § 3D1.4, two levels are added to the group with the highest level because there are two units, resulting in a total offense level of 39. Based on a criminal history score of one, the applicable Guidelines Range on Count One, grouped with Counts Five and Seven, is 262 to 327 months' imprisonment.

Additionally, pursuant to U.S.S.G. § 2K2.4(b), the Guidelines sentence for Count Six is 120 months' imprisonment, to run consecutively to any other term of imprisonment. Accordingly, the total applicable Guidelines Range for Ventura for all counts of conviction is 382 to 447 months' imprisonment, with a consecutive mandatory minimum of 120 months.

## Discussion

The Government respectfully submits that a sentence of at least 40 years for Torres and Owen, and a sentence of at least 25 years for Ventura are sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).[10] Probation has also recommended similar sentences. In three different PSRs prepared by three different probation officers, Probation recommended that the Court sentence Torres to 480 months' (40 years) imprisonment, Owen to 480 months (40 years) imprisonment, and Ventura to 300 months (25 years) imprisonment. (*See* Torres PSR at 30; Owen PSR at 26; Ventura PSR 25).

### A. The Seriousness of the Offense

Beginning with the nature and circumstances of the offense, it is impossible to overstate the devastation the Rollin' 30s—and these Defendants in particular—visited upon their community, spraying the streets with bullets, and supplying the surrounding blocks with illegal

---

[9] The Probation Department applied the role enhancement to the first shooting, but not the second. However, the testimony at trial demonstrated that while Ventura had attained his leadership status in the gang by the time of the second shooting in 2017; the record is silent as to whether Ventura had attained his leadership status in the gang by the time of the first shooting, in 2009. For that reason, the Government applies the role enhancement only to the second shooting. As a result, the Government's calculation of the total offense level differs from that of the Ventura PSR. (*Compare* Ventura PSR ¶ 59).

[10] Although not discussed individually below, these recommendations include the Government's consideration of the difficult of imprisonment during the COVID pandemic. All three recommendations are far below the applicable Sentencing Guidelines Ranges. The additional restrictions imposed by COVID protocols by the Bureau of Prisons do not provide a basis for a further reduction in the appropriate sentences for these defendants.

drugs. Those who were "lucky" lived in fear, never knowing when the shooting would start. The unlucky ones suffered serious injury, or worse; at least two lives were ripped away. The Defendants callously orchestrated, organized and participated in this gang activity, knowing full well the consequences of their actions.

### B. Victim Impact

The Court heard from a fraction of the Defendants' victims over the pendency of this case; others could not speak for themselves, their voice taken from them as a result of the Defendants' actions. They include:

- Nester Suazo, murdered after a brawl between the Certified Harlem Crips and Torres' Harlem Mafia Crips, when Torres ordered his co-conspirators to get a gun during the fight. Nester Suazo's sister, Maria Herrera, testified at the trial. (Tr. 1716-25). She described how Suazo—the youngest of her eight siblings—told her that he planned to go to the video shoot, how he was "excited, just like any other young person," to attend; and she described her anger, how she knew that the "type of people" he was spending time with were Crips, and how she did not want him to go. (*Id.* at 1718-19). The next day, she learned her brother had been killed. She described having to go to the hospital with her family, and being asked to identify her brother's body. (*Id.*). He was 25 years old.

- Victor Chafla, a father to seven children, murdered by Richard Feliz after Owen ordered Feliz and Domena to go find the "opps" on Morrison Avenue. Chafla was struck in the head with a bullet, and lingered for days before finally succumbing to his injuries. At Feliz's sentencing, Ms. Chafla, speaking through an interpreter, described how her father had come to the United States "looking for a better life for all of us. He was a quiet man, a hardworking man. And he didn't deserve what happened to him. We feel so empty not to have our father with us." (August 16, 2019 Tr. 10-11, attached as Exhibit 1). The loss of her father left her, and her family "with very empty hearts"; she seeks "justice for my father." (*Id.*).

- The Court also heard testimony at trial from Mr. Chafla's co-worker, Claribel Almanzar. (*See* Tr. 197-206). She explained how the day Mr. Chafla was murdered, she came by the store where he was killed to visit a friend, bringing along her seven-year-old son. As she stepped out of the store with Mr. Chafla to take a break and to chat, her son was riding his bike. She called out to warn her son not to go too far, and when she turned back, she saw that "Victor" had collapsed on the ground. She grabbed her son right away, and then began "screaming and screaming," trying to get help for her friend. (*Id.* at 202-03). And she described how Mr. Chafla remained in the hospital for days before he finally died; she was never able to see him again. (*Id.* at 205-06). She, too, is a victim.

- Larimel Blanco, a young mother, shot by Owen when he attempted to kill Felix Castillo. Ms. Blanco testified at the Defendants' trial. (Tr. 1225-31)**.** She recounted how the drive-by shooting happened in the middle of the day, about 1:00 p.m., right after she left work; she was going to the store before picking her daughter up from school. Ms. Blanco felt a burning sensation, and it was only when she took her hand

- away from her thigh, where she felt the injury, that she realized that she had "blood on the palm of [her] hand." (Tr. 1229).

- Another of Owen's victims from the drive-by, Juan Francisco Sierra, could not testify; he passed away prior to trial. But his daughter, Sylvia Serrano, twice spoke on her father's behalf—once when Miguel Caba, a/k/a "Miggs," was sentenced; and once at these Defendants' trial. (*See* May 10, 2019 Tr. at 16-18, attached as Exhibit 2; Tr. 137-150). Ms. Serrano described how, when her father was shot, he too was at a store, trying to get groceries for his wife. When Ms. Serrano learned that the shooting happened, she ran to find her father; she "found him on the floor," bleeding. After suffering multiple gunshot wounds, her father spent weeks upon weeks in a coma; Ms. Serrano explained how her father—the person who raised her, who had been married to his wife for 45 years— "had to learn to do everything like a little kid. He had to learn how to eat, how to talk, how to walk." (Ex. 2. at 17; Tr. 148). He was "never the same." (Ex. 2 at 17). And—incredibly—Mr. Sierra expressed that he wished to forgive the people who shot him. (*Id.* at 18).

- Kiana Bing—a young woman in her early twenties and the sister of one of Bromwell's friends—testified about finding and trying to help Bromwell right after Ventura shot him. (Tr. 268-81). She described hearing someone screaming, asking for help, and then seeing Bromwell trying to run away while holding his side. (*Id.* at 271-72, 281). Ms. Bing and her friend called 911, and went downstairs to help hold Bromwell's wound until EMTs could arrive. (*Id.* at 276).

Each one of these people—whether they were injured, killed, or irrevocably affected by being forced to witness the violence unfold next to them—is a victim. And yet, these are just a few of the many victims of the defendants' crimes, innocent individuals who lived and worked in the communities that the Rollin' 30s ravaged.

This was not the unintended consequence of the Defendants' actions. This was the point: to control with violence and intimidation what they claimed as their territory.

### C. Defendant-Specific Considerations

#### 1. Randy Torres

The Government respectfully submits that a sentence of at least 40 years' imprisonment, substantially below the Guidelines Range of life imprisonment, should be imposed on Randy Torres. Although Torres is only charged in Count One, the racketeering conspiracy count, his sentencing Guidelines are life imprisonment and his maximum sentence, because of his involvement in the Suazo homicide, is also life imprisonment.

Randy Torres held the highest position in the Harlem Mafia Crips subset of the Rollin' 30s, as well as a national leadership position. While Torres routinely had lower-ranking gang members carry out violence on his behalf, he was by no means isolated from or ignorant to the incredibly violent conduct of the gang. To the contrary, Torres was directly involved in his gang's violence, and played a central role in fueling the disputes that led to shootings, as well as in meting out

internal gang discipline. His role, which resulted in those below him unquestioningly carrying out his orders, including the order resulting in the murder of Nester Suazo, calls out for an extremely significant sentence.[11]

Torres, along with Owen, cultivated a culture of violence. Externally, when rival gangs were perceived to have challenged or insulted the gang, they ensured that gang members retaliated with violence. Internally, when subordinates did not follow their instructions or did not abide by the gang's unwritten rules – such as never running from a fight involving a fellow member – Torres and Owen ensured that members were swiftly and violently disciplined with physical assault by multiple other members of the gang. As just one example, Christopher Domena testified that he decided to join the gang, in part because his brother was already a Rollin' 30s member. (Tr. 1418). One day, at Ventura's home with Torres, Owen, and others, Owen and Torres pressured Domena to "turn Crip." Even though Domena—who was 16 years old—initially refused, Torres personally took him out into the hallway and brought Domena into the gang by fighting him for 30 seconds. As Domena testified, he "thought [he] had no option," and he felt he had to do it, because he was that he had "to do it….[b]ecause [Torres is] the OG." (*Id.* at 1419).

Torres, unlike his co-defendants, has no criminal history of note despite spending decades working his way up the leadership ladder of the Rollin' 30s. This is not coincidental. The gang concentrated its violent enforcement actions among its younger, more impressionable members, with the goal of insulating leaders like Torres and Owen from criminal investigation: younger members of the gang like Domena and Feliz were disproportionately tasked with selling narcotics on the street and committing shootings, while Torres and Owen operated behind the scenes. Torres also evaded law enforcement scrutiny by threatening others, including cooperating witness Nathaniel Rodriguez, from reporting.[12] In sum, Torres' absence of prior convictions in no way mitigates his conduct here or the need for a significant sentence. Conversely, the fact that to date, Torres has handily evaded law enforcement scrutiny for his multitude of crimes underscores the need for a serious sentence here. Despite having legitimate employment available to him as a janitor, (PSR ¶ 100), Torres chose an unlawful path—even using the school where he worked to conduct gang business. Moreover' Torres' high-ranking role in the gang makes the likelihood of his voluntary resignation from his life's work extremely low. Specific deterrence is therefore important here.

Likewise, general deterrence and the need to promote respect for the law advocate in favor of a lengthy sentence. Torres' Rollin' 30s operated in neighborhoods nearly overtaken by gang

---

[11] The sentence of Richard Feliz for his participation in the Chafla homicide provides no counterpoint to the argument for a sentence of at least forty years for both Torres and Owen. Feliz was a young gang member who did not have senior leader status in the gang. Moreover, Feliz – unlike the Trial Defendants – took responsibility for his conduct by pleading guilty and spared the victims of his crimes from enduring the trial.

[12] And when Torres and Owen suspected that Rodriguez, despite Torres's threats, was cooperating with law enforcement, they decided to kill Rodriguez if his cooperation was confirmed. (Tr. 967 ("[Owen] was like yes, [Torres] is saying the same thing. And we came up with the conclusion that if [Rodriguez] was cooperating, that we would crush him….Kill him.")).

control. Sending a strong message about the consequences of participating in gang activity is imperative.

### 2. Walston Owen

Walston Owen also faces a Guidelines Range of life imprisonment with a mandatory minimum sentence of ten years. The Government also respectfully submits that a sentence of at least forty years' imprisonment is appropriate.

Like Torres, Owen had an outsized role in the Rollin' 30s through his leadership of the Stratford Avenue line. As described above, this leadership resulted in many violent acts done by both Owen himself and his underlings. Most deadly, Owen's control led Domena and Feliz to conduct the shooting that led to Victor Chafla's death. As Domena testified, he knew that if he and Feliz were to disobey, they would be C-Ripped, or beaten, by Owen. (Tr. 1438). There was ample reason to believe Owen's threats. In addition to directing and encouraging violence, Owen committed numerous acts of violence himself. The evidence at trial included testimony and physical evidence documenting multiple shootings committed against Owen, including the drive-by shooting discussed above that seriously injured two bystanders, the violent slashing of Luchone Elzey, and a 2014 shooting in retaliation for Ventura being stabbed. (*See, e.g.*, Tr. 899, 1433).

Also like Torres, Owen had legitimate employment but nevertheless chose to engage in dangerous and unlawful activities. (*See* Owen PSR ¶ 101). These activities included calling for and running gang-wide meetings, (Tr. 322; 885; 1418-1419), collecting money for purchasing guns, (Tr. 892-893), supervising drug sales and using his apartment as a base of operations,[13] (Tr. 945). Owen's own criminal conduct more than merits a sentence of forty years; the underlying indictment in this case is evidence of how serious that conduct was – including multiple counts of assault, racketeering, and a firearms offense. But so too must Owen be deterred from coercing others from engaging in violent and drug-related conduct for his benefit and at his behest. There can be no serious dispute that Owen is a grave danger to the community on multiple fronts.

Owen's assertions to the contrary are laughable and an affront to the many people he personally shot, maimed, and caused to be murdered. (*See* Owen Sentencing Submission (Dkt. No. 632) 6-7: "Mr. Owen reports that at the time of his arrest his connection to the Rollin Crips was minimal. His co-defendants were known to him as much for the fact that they lived in and around his neighborhood as opposed to any alleged gang affiliation. He describes that 'gangs were not like they are today.'"). The evidence at trial, including the overwhelming evidence of his guilt of multiple attempted murders and his role in an actual murder -- including the testimony of a young man who was personally recruited by Owen as a boy, and weaponized by him to kill a rival gang member – flies in the face of any suggestion that his involvement in the gang was "minimal." Similarly, Owen's attempt to explain away his heinous conduct as a result of vulnerable recruitment is belied by the fact that Owen was not a mere participant, but an active, assertive

---

[13] This included storing guns at his apartment for use by the other gang members in his lineup. (*See* Tr. 894 ("All kinds of guns. 13s, .38s, .40s, AKs….Assault rifles."; "[Owen said] That those guns was for us if we needed them. If we lost them, buy it back. If you used it, bring it back.")).

leader in the gang – one who meted out discipline, recruited,[14] and oversaw numerous criminal plots under the auspices of "Big Homie" status.

### 3. Charles Ventura

The Government respectfully submits that a sentence of at least 25 years' imprisonment should be imposed on Charles Ventura. This sentence, which is well below the applicable Guidelines Range, is necessary to reflect the seriousness of Ventura's conduct, his criminal history, and the need to deter Ventura from committing similar conduct.

Although Ventura did not have the same high rank as Torres and Owen, the danger he posed to the community was no less evident. When Owen took on larger duties of controlling larger portions of the gang, Ventura became the highest-ranking member of the Stratford lineup. (Tr. 953). Ventura's apartment was one of the gathering spots for gang members, where they would meet and have access to firearms because Ventura kept guns at his apartment for the gang's use. (Tr. 906-907 ("Handguns, .40s, four-fifths [a .45 caliber handgun]"); Tr. 955 ("I went to Gutta crib and got a 45 Ruger")). And Ventura was not content to leave them in the apartment collecting dust; Ventura used them himself in attempts to kill others. In addition to the 2009 and 2017 shootings underlying Counts One, Five, Six and Seven, there was also testimony of other violence committed by Ventura. For example, as described above, Bailey testified that after he had been shot in the face by rival gang member Jadon Robinson in 2014, Ventura subsequently bragged to him that Ventura had gone out and shot at Robinson in retaliation. (Tr. 867). Ventura also distributed narcotics on Stratford as part of the gang. As Bailey testified, Ventura sold heroin, although it was not a significant activity for Ventura. (Tr. 943).

Like the other Trial Defendants, Ventura was involved in Rollin' 30s for many years. Ventura disputes his characterization in the PSR as a leader in the gang and the attendant two-level enhancement pursuant to U.S.S.G. § 3B1.1(c). Contrary to Ventura's assertions, Ventura's status was explicitly discussed at several points during the trial by all three cooperating witnesses – each of whom had personal knowledge of Ventura's rank. Rodriguez testified that Ventura was a "big homie" by the time Rodriguez was arrested – a status which he had previously explained as a primary leadership position. (Tr. 301). Bailey and Domena also testified that Ventura had leader status, explaining that Ventura was a "G" – which was the rank beneath Owen in the Stratford lineup. (See Tr. 878-79, 1413).

His criminal history is similarly reflective of his long-time participation in criminal activity. It includes convictions for criminal possession of a weapon at age 17 followed by a parole violation and revocation, and attempted assault at age 23 in connection with physically abusing his partner. (Ventura PSR ¶¶ 61-62). Despite his prior convictions, Ventura was not deterred from continuing to engage in criminal conduct and his continuing denial of responsibility for the grave offenses of conviction here makes clear that a significant sentence is needed to adequately deter him from committing further crimes.

---

[14] Cooperating witness Shaquille Bailey similarly testified that Owen approached him when he was 20 or 21 years old to join the Rollin' 30s.

September 15, 2022
Page 14

Finally, as with Torres and Owen, general deterrence and the need to promote respect for the law also militate in favor of a significant sentence. The Rollin' 30s and the other affiliated and rival gangs operating in the Bronx and elsewhere have long held their innocent residents hostage. Would-be imitators and gang members need to be deterred from attempting to continue the types of criminal conduct embraced by the defendants in this case.

In his submission, Ventura argues that he should be credited for 42 months that he previously served for a conviction in 2009 because the conduct underlying the conviction is relevant to the instant offense. Such a departure or variance would be entirely inappropriate. While it is true that the Guidelines contemplates that a downward departure had the sentence been undischarged at the time of sentencing, how much time and the defendant's conduct since the prior sentence are crucial. Section 2E1.1 sets for the Guidelines for racketeering conduct and application note four provides illuminating guidance when considering relevant conduct for which a defendant has previously served a sentence: "Where such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentence under § 4A1.2(a)(1) *and not as part of the instant offense*." (emphasis added). This is because in situations, as here, the defendant continued to continue engaging in criminal conduct for nearly another decade, the Guidelines and punishment for the instant offense should reflect all the criminal conduct that was subsequently perpetrated and went unpunished until now.

## Conclusion

For the reasons set forth above, the Government respectfully submits that the Court should impose a term of incarceration of at least forty years as to Torres and Owen, and at least twenty-give years as to Ventura.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: /s/
Anden Chow
Jacqueline Kelly
Assistant United States Attorneys
(212) 637-2348 / 2456

cc: Defense counsel (via ECF)