USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/20/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

        - against -

RANDY TORRES and WALSTON OWEN,

                    Defendants.

16 CR 809 (VM)

DECISION AND ORDER

VICTOR MARRERO, United States District Judge.

In February 2020, defendants Randy Torres ("Torres") and Walston Owen ("Owen") (together, "Defendants") were convicted, after a jury trial, of various offenses under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), related to their involvement and leadership within the Rollin' 30s gang, a subset of the national Crips street gang. At trial, Torres and Owen were convicted of, among other things, racketeering conspiracy in violation of 18 U.S.C. Section 1962(d) ("Section 1962(d)") ("Count 1") for their involvement in the murders of Nestor Suazo ("Suazo") and Victor Chafla ("Chafla").

On October 14, 2021, Defendants notified the Court that they had raised an objection to each of their presentence investigation reports ("PSR") and requested briefing on the objection. (See Dkt. No. 609.) Specifically, their objection is whether the murders of Suazo and Chafla qualified as either

(1) federal first- or second-degree murder or (2) voluntary manslaughter, for the purposes of calculating Defendants' United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") base offense levels. Defendants contend that the Court must apply the categorical approach and find that Torres and Owen should be sentenced under the Guidelines according to the federal offense of voluntary manslaughter. The Government counters that Probation's calculation, using federal first-degree murder for the Guidelines, is correct. The parties' briefing on the objections is now before the Court. (See Defendants' Objection Letter, Dkt. No. 619 ("Obj. Ltr."); Government Response, Dkt. No. 626 ("Resp."); Defendants' Reply, Dkt. No. 629 ("Reply").) For the reasons stated below, the Court finds that the appropriate section of the U.S.S.G. to apply is Section 2A1.2, the guideline for federal second-degree murder. The Court will use Section 2A1.2 to set the base offense level for Torres and Owen for purposes of their sentencing.

## I.   **BACKGROUND**

### A.   FACTUAL FINDINGS

The Court finds the following facts based on the testimony, documents and other evidence adduced at trial, and the PSRs submitted in this case. See United States v.

Shepardson, 196 F.3d 306, 309 (2d Cir. 1999) ("[A] sentencing court may rely upon any information available to it.").

Torres and Owen were both members of the Rollin' 30s gang, a subset of the national Crips street gang. (See "Torres PSR," Dkt. No. 542 ¶ 16; "Owen PSR," Dkt. No. 543 ¶ 18.) The Rollin' 30s had a hierarchy with more senior members referred to as "OGs" — short for "original gangsters" — and "Big Homies," or "Bigs." (See Torres PSR ¶ 21; Owen PSR ¶ 21.) The Government's witnesses testified at trial that Torres was the leader of the Rollin' 30s, (see Torres PSR ¶ 21; Owen PSR ¶ 21), and that Owen was a "Big Homie" who worked directly under Torres, (see Owen PSR ¶ 21).

Evidence and testimony presented at trial established that on September 19, 2015, Torres ordered a co-defendant, Derrick Richardson ("Richardson"), to "get a gun and shoot members of" a rival gang set, the Certified Harlem Crips ("CHC"). (See Torres PSR ¶ 20.) On that day, members of the Rollin' 30s were participating in a music video, and several other Crips subsets were invited to participate, including the CHC. (See id.) While Torres did not arrive on the scene with a weapon, Torres and a CHC member became involved in a disagreement that escalated to a larger fight between the CHC and the Rollin' 30s. (See id.) During the fight, a CHC member stabbed Torres, who then instructed Richardson and another

3

Rollin' 30s member to "get the grip," i.e., a gun, and shoot members of the CHC.[1] (See id.)

Torres followed a member of the CHC away from the initial fight to a bodega, where Torres punched Suazo. (See Reply, at 2 (collecting record citations).) Then, Torres left Suazo in the bodega and moved to another scuffle that had broken out down the street among rival gang members. (See id.) Moments later, Suazo followed Torres down the street. (See id.) Next, Richardson arrived with the gun he had retrieved, as Torres had directed, and shot and killed Suazo. (See Torres PSR ¶ 20.) During the altercation, the shots fired by Richardson also injured a female member of CHC. (See id.)

On March 26, 2015, Owen participated in the murder of an innocent bystander, Chafla. (See Owen PSR ¶ 22.) Earlier in the day, Owen provided Richard Feliz ("Feliz"), a RICO co-defendant here, information on the whereabouts of a rival gang member. (See id.) Testimony indicated that Owen stated to subordinates that "the opps was out there on Morrison," (Obj. Ltr. at 5), which caused Feliz to obtain a .40 caliber gun and to locate the rival gang member. (See Owen PSR ¶ 22) Once the rival gang member was located on a street, Feliz

---

[1]     Defense counsel objects to the characterization that Torres said to shoot CHC members, because the testimony at trial was that Torres "told fly to go get the gun out of the car." (See Torres PSR ¶ 20 n.2.)

fired multiple shots in his direction and struck Chafla in the head. (See id.) Chafla died from his injuries a few days later. (See id.)

The Government charged Torres and Owen in Indictment S8 16 Crim. 809 with, among other things, conspiracy to commit murder in aid of a racketeering conspiracy and charged the murders of Suazo and Chafla as a special sentencing consideration of violation of Sections 20.00 and 125.25 of New York Penal Law ("Section 125.25"). (See Dkt. No. 309.) At trial, a jury convicted Torres of Count 1, racketeering conspiracy in violation of 18 U.S.C. Section 1962(d), for his involvement in the murder of Suazo. The jury also convicted Owen of several offenses, including Count 1, for which the murder of Chafla was an underlying offense.[2] The jury was instructed that to find Torres and Owen guilty of the murders of Suazo and Chafla, it needed to find beyond a reasonable doubt that the murders were intentional, but the Court explained that a finding of "[i]ntent does not require premeditation." (See Dkts. Nos. 508-520, "Trial Tr." 2123:14). The murders of Suazo and Chafla are the subject of

---

[2]    In addition to racketeering conspiracy, Owen was convicted of assault and attempted murder in aid of racketeering, in violation of 18 U.S.C. Section 1959(a)(3) and 1959(a)(5) (Count 2); discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. Section 924(c) (Count 3); and assault in aid of racketeering (Count 4). (Owen PSR ¶¶ 5-7.)

Defendants' objection to the calculation of their base offense levels.

B.   THE PSR CALCULATION

On July 31, 2020 and August 10, 2020, Probation submitted the final PSRs for Torres and Owen, calculating Defendants' base and total offense levels for the purposes of sentencing. The parties agree that Section 2E1.1 should be used to calculate Defendants' base offense level. (See Obj. Ltr. at 2; Resp. at 2.) Since the underlying racketeering offense for Torres's and Owen's Section 1962(d) convictions was a violation of Section 125.25, Probation identified in the PSRs what it believed was the federal offense most analogous to Section 125.25.

In both PSRs, Probation referred to U.S.S.G. Section 2A1.1 to determine the base offense level for Defendants' murder convictions underlying Count 1 of the indictment. (See Torres PSR ¶ 43; Owen PSR ¶ 36.) Section 2A1.1 is titled "First Degree Murder" and applies only "in cases of premeditated killing[s]." See U.S.S.G. § 2A1.1, Application Note 1. By applying Section 2A1.1, Probation recognized 18 U.S.C. Section 1111 ("Section 1111") as the federal statute and offense most analogous to Section 125.25.[3] And by using

---

[3]   The next Guidelines section, Section 2A1.2, is titled "Second Degree Murder" and also refers to Section 1111 as a relevant statutory

Section 2A1.1 of the U.S.S.G., Probation calculated both Torres's and Owen's total offense levels to be 43,[4] resulting in a Guidelines sentencing term of life imprisonment. (See Torres PSR ¶¶ 43, 51; Owen PSR ¶¶ 36, 67.)

Probation recommends a 480-month sentence for Torres, based on Count 1 alone. (See Torres PSR at 30.) Probation also recommends a 480-month sentence for Owen (360 months for Count 1 followed by 120 months for Count 3). (See Owen PSR at 26.)

C.   THE PARTIES' ARGUMENTS

1.   Torres's and Owen's Objection

After the PSRs were finalized, Defendants raised objections to the calculation of their base offense levels and requested briefing on the issue. (See Dkt. No. 609; see also generally Obj. Ltr.; Reply.) In their letters, Defendants contend that Probation miscalculated the recommended sentences for both Torres and Owen because federal first-degree murder under Section 1111 is not the most analogous federal offense to Defendants' crimes.

---

provision because Section 1111 covers both first- and second-degree murders.

[4]   Under the Guidelines, where a total offense level exceeds 43, the offense level is treated as 43. See U.S.S.G. Ch. 5, Pt. A, Application Note 2.

Instead, Defendants contend that federal voluntary manslaughter under 18 U.S.C. Section 1112 is proper.

Defendants ask the Court to recalculate their base offense levels using Section 2A1.3, meaning, under Section 2E1.1, Torres's total offense level would be reduced to 33, inclusive of a role adjustment of four points. (See Obj. Ltr. at 5.) This adjustment would result in a Guidelines range of 135-168 months for Torres. (See id.) For Owen, his total offense level would be reduced to 32, inclusive of a role adjustment of 3 points, and a Guidelines range of 121-151 months. (See id.)

Defendants reach their conclusion that Section 1112 is the most analogous federal offense by arguing that "the offenses and proof presented in the instant case is not a generic murder and cannot be considered an 'act or threat constituting murder'" under the categorical approach. (Id. at 1.) In applying the categorical approach, Defendants contend that "the elements of the State offense [are required] to match the generic version of the offense in all ways. Thus, if the offense could be committed in a manner broader than the generic offense, then the State offense is not a match." (Id.; see also Reply at 1 (suggesting a "requirement for the use of the categorical approach")).

Defendants argue that Section 1111 is improper under the categorical approach. Defendants correctly state that Section 1111, as applied through U.S.S.G. Section 2A1.1, requires, first, "malice aforethought" and, second, "proof beyond a reasonable doubt of premeditation." (Obj. Ltr. at 3.) Defendants further argue that Torres and Owen were convicted under N.Y. Penal Law 125.25, which neither includes "elements of malice aforethought nor premeditation," (id.), and that the Court's jury instruction made clear that "intent does not require premeditation." (Id.) Thus, Defendants conclude that because not every murder under Section 125.25 would fall within the ambit of Section 1111, since some murders in violation of Section 125.25 may be conducted without "malice aforethought" or "premeditation," Section 1111's first-degree murder is not the proper federal offense by which to measure Torres's and Owen's sentences. (See id. at 2-3 (arguing that "[w]hen compared, it becomes clear that the State offense does not require all of [the] elements required by federal statu[t]es for intentional murder either in the first or second degrees.").)

2.  Government's Response

The Government responds that Probation's calculation is correct. The Government states that Defendants' argument rehashes their motion to strike the special sentencing

consideration of murder under Section 125.25 from the indictment, which the Court previously rejected. (See Resp. at 1 n.1; see also Trial Tr. 2046-47, (denying request to strike based on "case law cited by the government's letter" and "the Court's own research . . . where the same issue occurred . . . and [was] uniformly rejected.").)

The Government argues that Section 1111 is the correct analog and that the Court may find facts already in the record that would, by a preponderance of the evidence, support a finding of both malice aforethought and premeditation. The Government asserts both malice and premeditation are established because, in pertinent part, "Torres was not just retaliating blindly" after being stabbed but had "plenty of time to reflect upon his order" to Richardson to get the gun. (Resp. at 2-3.) By the time the gun arrived, Torres was in "a cool enough state of mind to appreciate what was happening and reevaluate his decision." (See Resp. at 2-3.) Likewise, to establish malice aforethought and premeditation for Owen, the Government points to the jury's rejection of Owen's claim at trial that Owen "had no idea that Feliz and Domena would try and kill the rival." (Id. at 4.)

## II.  **LEGAL STANDARD**

### A.  RELEVANT FEDERAL OFFENSES

As noted above, the indictment charged Defendants, and the jury convicted them, for the murders of Suazo and Chafla as a violation of Section 125.25 of the New York Penal Law. (See Dkt. No. 303 ¶¶ 9.a.i., 11, 12.) For purposes of calculating the Sentencing Guidelines for violations of Section 1962(d) — a RICO violation — Section 2E1.1 applies. Section 2E1.1 dictates that the base offense level to be used should be the greater of "19" or "the offense level applicable to the underlying racketeering activity." Where the latter measure is applied, as here, "if the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used." U.S.S.G. § 2E1.1, Application Note 2; see also United States v. Minicone, 960 F.2d 1099, 1110 (2d Cir. 1992) ("Although New York law would have categorized the murder of [the victim] only as second degree murder, the task of the district court was to find the offense level corresponding to the most analogous federal offense.").

Torres and Owen were convicted under Section 125.25 of the New York Penal Law. Under Section 125.25, a person is guilty of murder in the second degree when "[w]ith intent to

cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal L. § 125.25(1).

Under the Federal Criminal Code, murder is defined as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). Section 1111 then goes further, defining two degrees of murder: First-degree murder is every "murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing"; "[a]ny other murder is murder in the second degree." Id. "The salient distinction between first- and second-degree murder is 'the requisite mens rea.'" United States v. Cespedes, No. 11 Crim. 1032, 2015 WL 4597539, at *3 (S.D.N.Y. July 30, 2015) (quoting Untied States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000)).

First-degree murder under Section 1111 requires premeditation. Premeditation "requires a 'cool mind' that is capable of reflection" and that "the one with the 'cool mind' did, in fact, reflect at least for a short period of time before his act of killing." United States v. Mulder, 273 F.3d 91, 117 (2d Cir. 2001) (quoting United States v. Shaw, 701 F.2d 367, 393 (5th Cir. 1983)). However, "no particular period of time is necessary for such deliberation and premeditation." Shaw, 701 F.2d at 392-93 ("The period of time 'does not require the lapse of days or hours or even

minutes.'" (quoting Bostic v. United States, 94 F.2d 636, 638 (D.C. Cir. 1937), cert. denied, 303 U.S. 635 (1938))). Instead, "it is the fact of deliberation, of second thought[,] that is important." United States v. Catalan-Roman, 585 F.3d 453, 474 (1st Cir. 2009).

"Second-degree murder, by contrast, is a general intent crime that requires only malice aforethought." Cespedes, 2015 WL 4597539, at *4 (quoting Wood, 207 F.3d at 1228). "[S]econd degree murder's malice aforethought element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; [or] (3) depraved-heart[.]" United States v. Regnier, 44 F. App'x 524, 529 (2d Cir. 2009) (summary order); see also United States v. Velazquez, 246 F.3d 204, 214 (2d Cir. 2001) ("[T]he requisite malice can in some circumstances be found when the assailant acts with awareness of a 'serious risk of death or serious bodily harm.'") (citation omitted)).

"Voluntary manslaughter, on the other hand, is the killing of another without malice '[u]pon a sudden quarrel or heat of passion.'" United States v. Walters, 775 F. App'x 25, 27 (2d Cir. 2019) (quoting 18 U.S.C. § 1112(a)). In essence, "voluntary manslaughter functions . . . like a partial defense to murder," United States v. Steward, 880 F.3d 983, 987 (8th Cir. 2018), and "requires a mental state that would

be malice except for heat of passion or provocation."
Velazquez, 246 F.3d at 212. The "'heat of passion' defense is
normally unavailable after some interval of time has elapsed
between the provocation and the response." Id. at 213.

B.   THE CATEGORICAL APPROACH

Defendants' objections implicate the so-called
categorical approach. In short, the categorical approach
requires courts to look to "the statutory definition of the
crime of conviction" rather than the facts of the case. United
States v. Chappelle, 41 F.4th 102, 108 (2d Cir. 2022) (citing
Moncrieffe v. Holder, 569 U.S. 184, 190 (2013)). The Court
must look to "the intrinsic nature of the offense rather than
[to] the circumstances of the particular crime," and identify
"the minimum criminal conduct necessary for conviction."
United States v. Acosta, 470 F.3d 132, 135 (2d Cir. 2006). In
essence, a given crime must "qualify as a predicate offense
in all cases or none." Descamps v. United States, 570 U.S.
254, 268 (2013).

III. **DISCUSSION**

The Court must decide two issues. First, the Court must
determine whether the categorical approach should be used to
determine what is the most analogous federal offense under
U.S.S.G. Section 2E1.1. The Court concludes that the
categorical approach has no application here. Second, the

14

Court must decide what is the most analogous federal offense applicable here. Although it is a close call, the Court decides that federal second-degree murder under 18 U.S.C. Section 1111(a) is the most analogous federal offense for Defendants' convictions.

    A.   <u>THE CATEGORICAL APPROACH</u>

Defendants' argument is that the Court *must* apply the categorical approach to determine what is the most analogous federal offense for purposes of determining Defendants' base offense levels. Defendants maintain that application of the categorical approach dictates that the proper Guideline to apply is that for voluntary manslaughter, Section 2A1.3. The Court finds that the categorical approach does not apply in this instance based on the authority cited — and not cited — by Defendants, the plain text of Section 2E1.1, and Defendants' use of facts in purporting to apply the categorical approach to reach their desired result. Thus, the Court declines to apply the categorical approach here. The Court goes one step further and finds that, even if it were to apply the categorical approach in this instance, Section 125.25 murder is not categorically the same as the voluntary manslaughter statute, 18 U.S.C. Section 1112.

1.   <u>Defendants' Authority</u>

Defendants cite to numerous cases in support of their position that the categorical approach should be applied to determine the most analogous federal offense. The Court has reviewed the case law Defendants rely upon and finds that none of the cases they cite is on point. Those cases apply the categorical approach to determine whether certain predicate offenses qualify under the statutory definitions for terms such as "crime of violence" or "violent felony"; issues that have no relevance to the Court's determination here. (<u>See</u> Obj. Ltr. at 1-2 (citing <u>United States v. Nardello</u>, 393 U.S. 286, 295 (1969) (whether Pennsylvania's "blackmail" law fit categorically within the 18 U.S.C. Section 1952's prohibition on "extortion"); <u>Taylor v. United States</u>, 495 U.S. 575, 578, 602 (1990) (whether an offense constitutes a "violent felony" such as "burglary" for purposes of sentence enhancement under 18 U.S.C. Section 924(e)); <u>United States v. Davis</u>, 139 S. Ct. 2319, 2336 (2019) (requiring the categorical — as opposed to case-by-case — approach and finding residual clause of 18 U.S.C. Section 924(c) constitutionally vague); <u>United States v. Acosta</u>, 470 F.3d 132, 135 (2d Cir. 2006) (whether violating and conspiracy to violate civil rights while carrying a firearm are "crimes of violence" under Section 924(c)); <u>United States v. Hill</u>, 890 F.3d 51, 55 (2d

Cir. 2018) (whether Hobbs Act robbery is categorically a crime of violence under Section 924(c)'s "force clause"); <u>United States v. Barrett</u>, 937 F.3d 126, 127 (2d Cir. 2019) (vacating conviction under Section 924(c)'s residual clause for Hobbs Act robbery conspiracy after ruling in <u>Davis</u>); <u>United States v. Heyward</u>, 3 F.4th 75, 81 (2d Cir. 2021) (vacating conviction under Section 924(c)'s residual clause for RICO murder conspiracy after <u>Davis</u>)).)

None of these cases applies the categorical approach to determine the "most analogous federal offense" under Section 2E1.1, nor do they suggest that it would be appropriate to do so. Defendants point to no case, and the Court is not aware of any, that specifically applies the categorical approach to Section 2E1.1. Accordingly, the Court finds insufficient authority supporting Defendants' theory.

### 2.   <u>Section 2E1.1's Text and Second Circuit Precedent</u>

Defendants' argument is also belied by the text of U.S.S.G. Section 2E1.1, Application Note 2. Unlike the case of Section 2E1.1, the categorical approach asks the Court to identify "the minimum criminal conduct necessary for conviction under a particular statute," <u>Acosta</u>, 470 F.3d at 135, and to assess whether there is a "realistic probability . . . that the statute at issue could be applied

to conduct" that does not fit within the generic definition. Hill, 890 F.3d at 56 (citing Gonzales v. Duenas-Alvarez, 549 U.S. 183, 193 (2007)). Here, Defendants are correct that, in applying the categorical approach, the underlying statute must match on all points with the generic definition. (See Obj. Ltr. at 2); see also Descamps, 570 U.S. at 268 (crime must qualify "in all cases or in none"). Defendants' miss the point, however, because the plain text of Section 2E1.1 does not require the Court to find the *exact* matching statute, as the categorical approach does. Instead, Section 2E1.1 asks that the Court find only the "most analogous" federal offense.

When faced with the exact question of what is the "most analogous federal offense" for Section 125.25, the Second Circuit has consistently found that Section 1111 is the proper federal statute to consider. See, e.g., United States v. Minicone, 960 F.2d 1099, 1110 (2d Cir. 1992) ("We hold that the district court did not err in concluding the most analogous federal offense [to New York Penal Law Section 125.25] was first degree murder under Section 1111."); United States v. Carr, 424 F.3d 213, 230-31 (2d Cir. 2005) (concluding Section 1111 was most analogous offense: "[t]he absence of reference to premeditation or malice aforethought [in the state law] does not mean that federal first degree murder is not the most analogous federal offense"); see also

United States v. Diaz, 176 F.3d 52, 122-23 (2d Cir. 1999)
(finding same regarding Connecticut statute "nearly
identical" to Section 125.25).

And, as discussed below, every district court that has
assessed the issue (none applying the categorical approach)
has determined that Section 125.25 can be harmonized with
Section 1111's requirement that the murder be committed with
"malice aforethought," even if that element is not
specifically required by Section 125.25. As a court in this
district explained in United States v. Gotti:

> Malice aforethought is a term of art, used for
> centuries in the common law to delineate the state
> of mind deemed particularly worthy of
> punishment. . . . The Second Circuit has stated
> that malice aforethought can be shown through proof
> of intent to cause serious bodily harm, killing in
> the commission of a felony, or "when an assailant
> acts with awareness of a serious risk of death or
> serious bodily harm" . . . . The Modern Federal
> Jury Instructions suggest that malice is the 'state
> of mind that would cause a person to act without
> regard to the life of another . . . [and] may be
> proven by evidence that the defendant acted
> consciously with intent to kill or if the
> Government proves "reckless and wonton conduct on
> the part of the defendant which grossly deviated
> from a reasonable standard of such care such that
> he was aware of the serious risk of death."

2004 WL 2389755, at *7 (S.D.N.Y. Oct. 26, 2004) (internal
citations omitted). Thus, the Gotti court found that Section
1111, first-degree murder, was the most analogous federal
offense to Section 125.25.

While courts in this Circuit agree that Section 1111 is the proper federal statute to apply to the circumstances presented here, Section 2E1.1 dictates that the Court must find the analogous "federal offense." Thus, because Section 1111 is bifurcated into two offenses (first- and second-degree murder) courts must determine which offense is most analogous.

Courts have not always agreed on whether a finding that Section 1111 is proper dictates application of U.S.S.G. 2A1.1 (first degree murder), or whether 2A1.2 (second degree murder) could also apply. For example, the Northern District of New York in Williams v. United States found the most analogous federal offense to Section 125.25 was Section 1111 and applied Section 2A1.1 to set the defendants' base offense level. No. 03 Crim. 026, 2011 WL 13324077, at *6-7 (N.D.N.Y. Apr. 21, 2011). In Williams, as part of the racketeering conspiracy, defendant was charged under Section 125.25 with "intent to cause the death of" a person. Id. Citing Minicone and Carr, the court concluded that petitioner's argument that Section 2A1.2 could apply was "without merit," went no further in discussing the issue, and applied Section 2A1.1 (first-degree murder) as the relevant Guideline. Id.

In contrast to Williams, a court in this district in United States v. Cespedes determined, after considering

evidence at a Fatico hearing, that Section 2A1.2 could be the analogous federal offense to Section 125.25 where "the facts are more consistent with second-degree than first-degree murder." 2015 WL 4597539, at *2-4. Neither Williams nor Cespedes applied the categorical approach in reaching these conclusions. And the Court is persuaded that the Cespedes decision is correct; either first- or second-degree murder are viable analogous federal offenses for the Court to consider. Accordingly, after reviewing the text of Section 2E1.1, and controlling Second Circuit doctrine, the Court finds the categorical approach could not apply here, and based on precedent in this Circuit, could find that either first- or second-degree murder is an analogous federal offense.

### 3.   The Parties' Case-Specific Theory

Beyond comparing the elements of Section 125.25 with Section 1111, Defendants (and the Government) ask the Court to consider numerous facts purporting to support their argument as to which federal statute is most analogous. Both parties are, in essence, asserting that a "case-specific theory" of the categorical approach applies to determine the most analogous federal offense. But see Davis, 139 S. Ct. at 2327.

Defendants argue that the facts establish that neither Torres nor Owen had the requisite "malice aforethought" for

Section 1111, nor did Torres or Owen commit a premeditated murder, a necessary element for a federal first-degree murder charge. For its part, the Government, although not making a head-on challenge to the propriety of using the categorical approach or the case-specific theory, characterizes many of the same facts as establishing malice aforethought.[5]

Delving into the underlying factual circumstances of a particular crime is appropriate for purposes of sentencing generally. See United States v. Proshin, 438 F.3d 235, 238 (2d Cir. 2006) ("The government must prove and the district court must find a fact relevant to sentencing by a preponderance of the evidence . . . [and] is entitled to rely on any facts available to it."). But doing so is inconsistent with Supreme Court and Second Circuit instruction on how courts must apply the categorical approach. See, e.g., Taylor, 495 U.S. at 600 (instructing courts to "look only to the statutory definitions," i.e., to the elements of the offense, "not to the particular [underlying] facts"); Davis, 139 S. Ct. at 2327 (rejecting "case-specific theory" of categorical approach); Acosta, 470 F.3d at 135 ("[W]e focus on the intrinsic nature of the offense rather than on the

---

[5]    The Government asserts only that Defendants' reference to the categorical approach attempts "to sow confusion" and is "irrelevant for the purposes of sentencing."  (Resp. at 2 n.2.)

circumstances of the particular crime."); United States v. Capers, 20 F.4th 105, 117 (2d Cir. 2021) ("The categorical approach directs us that to determine whether an offense constitutes a crime of violence, we are to consider not the particular conduct disclosed by the evidence presented in the case, but the *elements* of the offense as defined by the statute."). Because Defendants ask the Court to assess underlying facts, and the Court agrees that it should, the Court is further persuaded that the categorical approach does not apply.

    4.   <u>Applying the Categorical Approach to Section 1112</u>

Although Defendants contend that the categorical approach must be applied, they also do not explain fully how Section 125.25 is categorically the same as Section 1112, their desired federal statute, choosing only to attack Section 1111. While the Court finds that the categorical approach does not apply in this instance, the Court also assesses whether Section 125.25 is categorically the same as Section 1112. The Court finds it is not.

Defendants assert that Section 1111 is *not* the most analogous federal offense because Section 125.25 makes an exception to murder if the "defendant acted under the influence of extreme emotional disturbance for which there

was reasonable explanation or cause." N.Y. Penal L. § 125.25(1)(a)(i). Defendants continue that because "malice aforethought" under the federal statute requires the "absence of extenuating circumstances," Section 125.25 murder could be committed in a manner that falls outside Section 1111. (See Obj. Ltr. at 2); but see infra note 6. Thus, by excluding Section 1111, Defendants conclude that Section 1112 is the most analogous offense. (Id.)

But by applying the same approach and looking only at the elements of Section 125.25 — as the Court must, see Capers, 20 F.4th at 117 — the Court finds that Section 125.25 also does not categorically align with Section 1112. For example, murder under Section 125.25 can be committed "with intent to cause the death of another person" or "under circumstances evincing a depraved indifference to human life." The Second Circuit has construed the mens rea required for Section 125.25 — including intent or recklessness — as sufficient to constitute "malice aforethought" under the federal statute. See United States v. Thomas, 34 F.3d 44, 48-49 (2d Cir. 2004); Velazquez, 246 F.3d 204, 214 (2d Cir. 2001). Defendants do not assert that a murder could never be conducted under Section 125.25 in a way that evinces malice. Rather, they argue only that such a murder did not occur in this case. But as discussed above, if the Court were applying

the categorical approach, it should not assess the underlying facts. So, because Section 1112 requires that the murder be committed "without malice," and, theoretically, Section 125.25 murder *could* be committed with malice, Section 125.25's elements are not categorically the same as Section 1112, and Defendants' argument fails.

For the reasons discussed above, the categorical approach does not apply for determining what is the "most analogous federal offense" for the purposes of calculating the base offense level under U.S.S.G. Section 2E1.1. And even if the Court did apply the categorical approach, it finds that Section 1112 is not categorically the same as Section 125.25.

B.   THE MOST ANALOGOUS FEDERAL OFFENSE

With the categorical approach issue resolved, the Court must now find the most analogous federal offense. First, the Court finds that Section 1111, rather than Section 1112, is the proper federal statute for this purpose.  Then, the Court concludes that Section 1111, second-degree murder, is the most analogous federal offense for both Torres and Owen, and that their base offense levels should be re-calculated based on that conclusion.

1.   <u>18 U.S.C. Section 1111</u>

The facts found by the jury and in the PSRs, supporting Defendants' conviction under Section 125.25, establish that Section 1111 is the most analogous statute for the Court to consider. Although Defendants "dispute the need for further fact finding," (Obj. Ltr. at 4), Defendants' argument that Section 1112 is the most analogous federal offense would require the Court to revisit the underlying facts supporting the jury's conviction, dispose of them, and substitute its own. In that way, Defendants appear to be challenging not just Probation's application of the sentencing guidelines, but also the Court's jury instructions.

The Court declines to revisit its jury instructions. Defendants had previously raised a challenge to the Court's jury instructions, which the Court rejected. The Court's instructions asked the jury to determine whether the Government proffered sufficient evidence to prove guilt under Section 125.25. The instructions did not ask the jury to consider whether Torres or Owen committed manslaughter by acting "under the influence of extreme emotional disturbance," N.Y. Penal L. 125.25(1)(a)(i).[6] Indeed, the

---

[6]    Defendants assert that if the Court finds that Torres acted under "extreme emotional disturbance," then Section 1112 is most analogous by having "sudden quarrel" or with "heat of passion" as elements. (<u>See</u> Obj. Ltr. 2-5; <u>see generally</u> Reply.) But a conviction abated by the affirmative defense of acting "under the influence of

Court considered argument on this exact issue, and declined to allow the jury to draw any inferences with respect to the influence of the fight and subsequent stabbing of Torres on Torres' mens rea (or that of the Rollin' 30s member who fired the gun). (See Trial Tr. 1587:22-1588:7). The Court further declined to instruct the jury on whether "Mr. Torres had the extreme emotional disturbance" to establish the affirmative defense under Section 125.25(1)(a)(i). (Trial Tr. 1592:4-15).[7]

With respect to Owen, Defendants do not argue that Owen's order resulting in Feliz shooting and killing Chafla was made amidst any quarrel or heat of passion, arguing only that Owen lacked "malice aforethought." (See Obj. Ltr. at 5.)

The jury instructions for both Torres and Owen under Section 125.25 required the jury to find beyond a reasonable doubt that the murders were committed with "intent." (Trial Tr. 2123:9-13.) As described above, Courts in this Circuit generally hold that malice aforethought under the federal

---

extreme emotional disturbance" would not be a conviction under Section 125.25 at all, but one under N.Y. Penal Law Section 125.20. See also Patterson v. New York, 432 U.S. 197, 206 (1977) (explaining that Section 125.25 "provide[s] an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation which, if proved by the preponderance of the evidence, would reduce the crime to manslaughter, an offense defined in a separate section of the statute").

[7]  In a similar vein, the jury was specifically instructed *not* to consider any "passing references to self-defense." Tr. 2124:19-23.

statute includes intentional killings, like Torres's and Owen's, under New York's Section 125.25. See, e.g., Thomas, 34 F.3d at 48-49; Gotti, 2004 WL 2389755, at *7; Cespedes, 2015 WL 4597539, at *2-4. Thus, the proper *statute* to consider applicable to the question of intentional killing is Section 1111.

### 2.   First- or Second-Degree Murder Under Section 1111

"The [remaining] task of the district court [now, is] to find the offense level corresponding to the most analogous federal offense." United States v. Minicone, 960 F.2d 1099, 1110 (2d Cir. 1992). Accordingly, the Court must determine whether the most analogous offense is first- or second-degree murder under Section 1111.

"The only difference between the two degrees of murder, sharing as they do the requirement that the murderer have acted with 'malice aforethought,' is . . . that a first-degree murder . . . must be 'premeditated.'" Cespedes, 2015 WL 4597539, at *3 (quoting United States v. Delaney, 717 F.3d 553, 556 (7th Cir. 2013)); see also Wood, 207 F.3d at 1228 ("Second-degree murder, by contrast, is a general intent crime that requires only malice aforethought.").

Although Defendants dispute that either Torres or Owen had malice aforethought, the Court disagrees and is persuaded

by the abundance of Second Circuit case law on this issue discussed above. Further, the parties focus their arguments on whether there is evidence sufficient to establish *premeditation*, which "can be proved by circumstantial evidence." United States v. Begay, 673 F.3d 1038, 1043 (9th Cir. 2011). The parties take opposing views.

Defendants' argument against a finding of premeditation for Torres is simple and ties in with their argument that Section 1112 (voluntary manslaughter) is the appropriate analogous federal offense. Defendants contend that Torres could not have had malice aforethought or premeditation because Torres was stabbed twice before ordering Derrick Richardson and others to get the gun; because after beating Suazo in the bodega, Torres walked away, "demonstrating no further interest in doing harm to him"; and because Torres did not explicitly order anyone to shoot and kill any members of the rival gang or, more specifically, Suazo.[8] (See Obj. Ltr. 3-5.) Defendants emphasize that the Court's jury instructions did not require the jury to find that Torres or Owen acted with premeditation. (See Obj. Ltr. at 2 (citing

---

[8]     Defendants specifically object to the Torres PSR as far as it suggests that Torres ordered "Rollin' 30s member[s] to get a gun and shoot members of the CHC." (Torres PSR ¶ 20 n.2.)

Trial Tr. 2123:14 ("Intent does not require premeditation.")).)

The Government counters that Torres was not operating blindly or under the heat of passion, pointing to Defendants' concession that after beating Suazo in the bodega, Torres "calmly walked out," allowing time for Torres to reconsider his order to get the gun. (Resp. at 3.) This, combined with Torres's previous comment that he was "going to handle this situation," (Trial Tr. 479:9-10), and the fact that he had the presence of mind to remember he had access to a gun and to order others to retrieve it, establishes both malice aforethought and premeditation. (Resp. at 3.)

Defendants' argument for Owen's lack of premeditation is also straightforward: Feliz's premeditation, which the jury could reasonably infer, does not transfer to Owen; the mere statement that "the opps was out there on Morrison" does not evince malice aforethought. (Obj. Ltr. at 5.)

The Government responds that due to Owen's position of authority, the message conveyed by Owen's statement was meant and understood as an order to Feliz to shoot and try to kill their rival. (See Resp. at 4.) Further, the Government points out that Owen raised the same argument at trial and in a post-trial motion, and both arguments were rejected by the jury and the Court, respectively. (Id.)

To determine whether first- or second-degree murder is proper, the Court first must be satisfied that Torres and Owen had the requisite "malice aforethought." The Government's argument and underlying facts are persuasive on this point. Torres, a leader of the Rollin' 30s, told others he was "going to handle this situation," referring to issues with CHC, then directed subordinates to get a gun after being stabbed, i.e., to retaliate. (Resp. at 3.) Torres attacked Suazo in a bodega but walked away calmly. Then, Richardson arrived on the scene with the gun Torres had ordered him to collect and shot and killed Suazo.

The acts described above, which the jury found established Torres committed second-degree murder under Section 125.25, are also sufficient to establish that Torres acted with malice and not amidst a sudden quarrel. See Velazquez, 246 F.3d at 212. Based on these facts, the Court finds that Torres acted with at least an "intent to cause serious bodily harm," "recklessness," or "the state of mind that would cause a person to act without regard to the life of another." Gotti, 2004 WL 2389755, at *7 (citations omitted). Thus, Torres's participation in the murder of Suazo was committed with malice aforethought.

Next, the Court determines whether these (or other) facts establish premeditation. While the Court may find by a

preponderance of the evidence, see Proshin, 438 F.3d at 238, that the facts establish premeditation, it is not required to do so to because Section 1111 comprises both degrees of murder. This is particularly true given that the jury was not required to find premeditation. On this issue, the Cespedes case is illustrative.

In Cespedes, the evidence established that "defendants decided to retaliate against a rival gang member for attempting to attack" one of their leaders. Cespedes, 2015 WL 4597539, at *4. Like with Torres, testimony in Cespedes indicated that the gang members were intent on "tak[ing] care of the situation," and that an intent to kill, at least for one of the members, may have established premeditation as it "emerged when he found the [weapon] and decided to arm himself with it," before going to attack the rival. Id. at *5. But, because "the direct evidence [did] not clearly resolve whether the gang members intended in advance to kill [the rival]" the court turned to circumstantial evidence, which it found was "more consistent with an intent to assault than an intent to kill." Id. The Cespedes court then found that while there was no "dispute that the gang members planned an attack . . . the nature of the killing . . . was not so particular and exacting that the defendant must have intentionally killed according to a preconceived design." Id.

Thus, the court could not find a premeditated specific intent to commit an unlawful killing and determined that the "murder therefore qualifie[d] as a second-degree murder within the meaning of 18 U.S.C. Section 1111." Id. at *6. As the court found in Cespedes, the facts described above for Torres do not suggest that Suazo was killed according to a preconceived design. Instead, these facts are more closely aligned with second-degree murder under Section 1111, and the Court so concludes.

Likewise, concerning Owen, the Court also finds the facts described as establishing second-degree murder under Section 1111. Owen's position of leadership and his order to subordinates that the "opps were out on Morrison," causing Feliz to retrieve the gun, seek out the rival, and shoot killing Chafla, establishes malice aforethought because it is at least "reckless and wanton conduct on the part of . . . [Owen] which grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death." 2 L. Sand, et al. Modern Federal Jury Instructions ¶ 41.04 (2004); see also Section 125.25 ("[u]nder circumstances evincing a depraved indifference to human life, [the defendant] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person"). Similarly, while the Court may

find these facts sufficient to establish premeditation, it need not take the additional step and declines to do so here. See Cespedes, 2015 WL 4597539, at *6. As the Court does for Torres, the Court concludes that the most analogous federal offense for Owen is federal second-degree murder under Section 1111.

### C.   SENTENCING GUIDELINES CALCULATION

Probation had calculated both Torres's and Owen's base offense level under U.S.S.G. Section 2E1.1 by reference to U.S.S.G. Section 2A1.1 (first degree murder) as the most analogous federal offense, setting a base offense level of 43. (See Torres PSR ¶ 43; Owen PSR ¶ 36.) After adjustments for their leadership roles in the Rollin' 30s, Probation calculated the total offense level for Torres as 47 and for Owen as 46. (See Torres PSR ¶ 51; Owen PSR ¶ 67.) Probation then correctly adjusted the total offense level down to 43 pursuant to U.S.S.G. Chapter 5, Part A, Application Note 2, which dictates that "[a]n offense level of more than 43 is to be treated as an offense level of 43." (See Torres PSR ¶ 51; Owen PSR ¶ 67.) Pursuant to a total offense level of 43 and criminal history Category I, the Guidelines sentencing table dictates a life sentence for both Torres and Owen. Probation

recommends, as to Count 1 (at issue here), 480 months for Torres and 360 months for Owen.[9]

As discussed above, the Court concludes that, here, second-degree murder is the most analogous federal offense. The substantive effect of that decision on Torres's and Owen's Guidelines calculation, while important, is not material. Under U.S.S.G. Section 2A1.2, the base offense level for federal second-degree murder under Section 1111 is 38, which applies to both Torres and Owen via Section 2E1.1. Torres then receives a four-point adjustment for his leadership role, bringing his total offense level to 42, and Owen receives a three-point adjustment for his role, setting his total offense level at 41.[10] The respective guidelines ranges for a total offense level of 42 is 360 months to life for Torres, and, at a total offense level of 41, 325 to 405 months, for Owen.[11] Thus, by concluding that the most analogous federal offense for Defendants' conviction is 18 U.S.C. Section 1111, federal second-degree murder, the Court will use the offense levels mentioned above, corresponding to

---

[9]    Probation, however, recommends a total sentence of 480 months for Owen due to a recommended 120-month sentence for Count 3 to run consecutively. (Owen PSR at 26.)

[10]   Although Defendants disagree that second-degree murder is the proper guideline to use, Defendants do not dispute that these alternative calculations are accurate. (See Obj. Ltr. at 5 n.5.)

[11]   Probation's recommended sentences for Torres and Owen fall within the Guidelines range re-adjusted for federal second-degree murder.

U.S.S.G. Section 2A1.2, to calculate the applicable Guidelines range.

## IV.  <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that Defendants' objections to the Probation Office's calculations of the base offense level and United States Sentencing Guidelines ("Guidelines") range in the presentence investigation reports are **DENIED**; and it is further

**ORDERED** that second-degree murder under 18 U.S.C. Section 1111 is the most analogous federal offense to Torres's and Owen's convictions under New York Penal Law Section 125.25, for their respective participation in the murders of Nestor Suazo and Victor Chafla. As a result, the Court will use the offense level corresponding to United States Sentencing Guideline Section 2A1.2 to calculate Torres's and Owen's base offense level and the applicable Guidelines range.

**SO ORDERED.**

Dated:     September 20, 2022
           New York, New York

_____
           Victor Marrero
           U.S.D.J.

36